1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         SOUTHERN DISTRICT OF CALIFORNIA

10

11   VINH V. LE,                      )   Civil No. 05cv2030 WQH (RBB)
                                      )
12              Plaintiff,            )   **REPORT AND RECOMMENDATION RE:**
                                      )   **DENYING PLAINTIFF'S MOTION FOR**
13   v.                               )   **JUDGMENT REVERSING THE**
                                      )   **COMMISSIONER'S ORDER [DOC. NO.**
14   JO ANNE B. BARNHART,             )   **8] AND GRANTING DEFENDANT'S**
     COMMISSIONER OF SOCIAL SECURITY  )   **CROSS-MOTION FOR SUMMARY**
15   ADMINISTRATION,                  )   **JUDGMENT [DOC. NO. 10]**
                                      )
16              Defendant.            )
     _____)

17

18       Plaintiff Vinh V. Le seeks judicial review of Social Security

19   Commissioner Jo Anne B. Barnhart's determination that he is not

20   entitled to disability benefits.  On October 27, 2005, Le filed his

21   Complaint for Reversal of the Commissioner's Final Decision [doc.

22   no. 1].  On February 10, 2006, Plaintiff filed a Motion for

23   Judgment Reversing the Commissioner's Order [doc. no. 8] and

24   Memorandum in Support of Motion [doc. no. 9] requesting reversal of

25   Administrative Law Judge ("ALJ") James Carletti's June 24, 2005,

26   decision that Plaintiff was not disabled.

27       Le argues the ALJ's finding is not supported by substantial

28   evidence because "the defendant ignored the opinions of the

                                      1                    05cv2030 WQH (RBB)

plaintiff's treating physicians and clinical evidence indicating that the plaintiff is disabled due to a combination of cardiovascular and musculoskeletal disease, neck pain and back pain, depression and post-traumatic stress syndrome." (Pl.'s Mot. 1-2.) Le also contends Judge Carletti's opinion is based on an error of law because the ALJ failed "to develop the record fully and fairly" and failed "to provide specific and legitimate reasons for disregarding the opinions of the plaintiff's treating physicians" in favor of medical expert Dr. Bolter's opinion. (Id.)

In his Memorandum in Support of Motion, Le also alleges the ALJ's decision is in error for several additional reasons: (1) Judge Carletti incorrectly found Plaintiff did not meet or equal social security disability listings 12.04 or 12.06; (2) the ALJ improperly rejected Le's objective and subjective symptom testimony; (3) Judge Carletti should have found Plaintiff disabled according to the "Grids," solely based on Le's exertional limitations and (4) the act of driving is not a simple and repetitive task. (Pl.'s Mem. 1, 5-18; Pl.'s Reply 2-5.) Le asks this Court to reverse the Commissioner's determination and remand his case for the payment of benefits from July 1, 2003, through the present. (Pl.'s Mem. 25; Pl.'s Reply 10.)

On March 13, 2006, the Commissioner filed a Cross-Motion for Summary Judgment [doc. no. 10] and a Memorandum of Points and Authorities in Support of Cross-Motion [doc. no. 11]. Defendant also filed an Opposition to Plaintiff's Motion for Summary Judgment [doc. no. 13]. Le filed a Reply in Support of Motion for Judgment Reversing the Commissioner's Decision on April 3, 2006 [doc. no.

1   15].   Pursuant to Civil Local Rule 7.1(d)(1), the Court found this

2   matter suitable for decision without oral argument [doc. no. 16].

3                              **I.   BACKGROUND**

4       Plaintiff was born in Vietnam on May 20, 1949; he was fifty-

5   six years old at the time of the ALJ's decision. (Admin. R. at 16,

6   63.)  He attended school in Vietnam through the eighth grade. (<u>Id.</u>

7   at 16, 336.)  Plaintiff has limited English skills, but he can read

8   and write Vietnamese. (<u>Id.</u> at 70, 267, 335.)

9       As a member of the South Vietnamese Army, Le was incarcerated

10  in Vietnam for six months after the Communist government came to

11  power in 1975. (Pl.'s Mem. 2.)  He was beaten while in prison.

12  (<u>Id.</u>)  Upon his release, Plaintiff worked as a farmer in Vietnam

13  until he came to the United States in 1989. (Admin. R. at 297.)

14  From August 1991 through July 1, 2003, Le worked as a newspaper

15  delivery person for the <u>San Diego Union Tribune</u>. (<u>Id.</u> at 71-72,

16  335.)  Plaintiff states he was laid off from his employment because

17  he contracted tuberculosis. (<u>Id.</u> at 71.)

18      Le filed applications for Disability Insurance Benefits and

19  Supplemental Security Income ("SSI") on December 2, 2003, alleging

20  his disability began on July 1, 2003. (<u>Id.</u> at 63, 71.)  Plaintiff

21  claimed to suffer from "[p]ost tuberculosis disease, chronic

22  [h]eadache, fainting spells, arthritis pain, skin allergy and

23  scratches, frequent fever, coughing, sweating, insomnia,

24  nightmares, memory [l]oss, [a]nxiety, and depression." (<u>Id.</u> at

25  71.)

26      Plaintiff's applications were denied on March 2, 2004. (<u>Id.</u>

27  at 33, 304.)  Le filed a request for reconsideration on April 29,

28  2004. (<u>Id.</u> at 37.)  Upon reconsideration, Plaintiff's applications

were again denied on July 30, 2004. (<u>Id.</u> at 39, 309.) On August 12, 2004, Le timely requested a hearing before an ALJ. (<u>Id.</u> at 45.) Judge James S. Carletti conducted a hearing on Plaintiff's application on March 21, 2005. (<u>Id.</u> at 331.) Attorney Alexandra T. Manbeck represented Le at the hearing. (<u>Id.</u>) Bonnie Sinclair, a vocational expert, testified regarding Le's ability to work. (<u>Id.</u>) Sidney Bolter, M.D., provided medical expert testimony. (<u>Id.</u> at 60, 331.) On June 24, 2005, the ALJ issued a decision denying Plaintiff's request for benefits. (<u>See id.</u> at 16-27.)

The Social Security Administration's Appeals Council denied Le's request for review of Judge Carletti's decision on September 28, 2005. (<u>Id.</u> at 7.) Accordingly, the ALJ's decision became the final decision of the Commissioner of the SSA. (<u>Id.</u>) Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on October 27, 2005. (Compl. 1); <u>see</u> 42 U.S.C.A. §§ 405(g), 1383(c)(3) (West Supp. 2006).

## II.   MEDICAL EVIDENCE

### A.   <u>Le's Physical Impairments</u>

Plaintiff's doctor in 2003 was Dr. Kiem Duc Pham. (Admin. R. at 157-65.) Le saw Dr. Pham on February 20, 2003, complaining of congestion lasting for two days and a stuffy nose. (<u>Id.</u> at 162.) Dr. Pham diagnosed Plaintiff with an upper respiratory infection and prescribed an antibiotic, an antihistamine, and ibuprofen. (<u>Id.</u>); Neil M. Davis, <u>Medical Abbreviations:  10,000 Conveniences at the Expense of Communications and Safety</u> 220 (7th ed. 1995); A-Z Health Guides from WebMD:  Drugs, Erythromycin, http://www.webmd. com/drugs/mono-15-ERYTHROMYCIN+BASE%2c+ERYTHROMYCIN+STEARATE+-+ORAL +TABLET.aspx (last visited Aug. 21, 2006); A-Z Health Guides from

1    WebMD:  Drugs, Phenergan Oral,http://www.webmd.com/drugs/drug-6606-
2    Phenergan+Oral.aspx (last visited Aug. 21, 2006).

3        Le was referred for an eye examination on March 21, 2003,
4    because he had a piece of plastic in his eye.  (Admin. R. at 163,
5    177.)  On July 2, 2003, Plaintiff again visited Dr. Pham,
6    complaining of cough with sputum, a mild fever, and nighttime
7    wheezing for the previous three days.  (Id. at 160.)  Le also
8    complained of skin problems.  (Id.)  Plaintiff was not wheezing
9    during the doctor visit, but he was diagnosed with bronchitis and
10   psoriasis and given erythromycin (the same antibiotic he had taken
11   in February 2003), an Albuterol inhaler, Derma Soothe lotion, and
12   topical Fluocinonide.  (Id.); A-Z Health Guides from WebMD:  Drugs,
13   Derma Soothe Top, http://www.webmd.com/drugs/drug-64451-Derma
14   +Soothe+Top.aspx (last visited Aug. 21, 2006); A-Z Health Guides
15   from WebMD:  Drugs, Fluocinonide Top, http://www.webmd.com/drugs/
16   mono-719-FLUOCINONIDE+ -+TOPICAL.aspx (last visited Aug. 21, 2006).
17   Dr. Pham also referred Le for a chest x-ray.  (Admin. R. at 160);
18   Davis, supra, at 60 (showing "CXR" means chest x-ray).  The x-ray
19   showed "[c]hronic parenchymal changes at bilateral apices[, but n]o
20   cardiomegaly or congestive failure" and "[n]o acute process[,]"
21   meaning that cellular changes could be seen at the apices of the
22   lungs, but no pathologic conditions or diseases were present.
23   (Admin. R. at 173); Stedman's Medical Dictionary 1300, 1429
24   (Marjory Sraycar et al., eds., 26th ed. 1995).

25       Le continued to complain of the same symptoms, plus night
26   sweats, at a visit on July 10, 2003.  (Admin. R. at 161.)  Dr. Pham
27   prescribed Robitussin and Tylenol and ordered lab tests and another
28   chest x-ray.  (Id. at 161, 174-76.)  Plaintiff's lipoprotein-

cholesterol ratio was low, and his level of neutrophils -- a specific type of mature white blood cell -- was high, but Le's other lab results appeared normal. (Id. at 174-75); Stedman's Medical Dictionary, supra, at 1207. The chest x-ray showed "a left apical soft tissue mass approximately 3 cm in diameter, with possible . . . scarring in the left upper lobe." (Admin. R. at 176.) The doctor who interpreted the x-ray, Dr. Michael L. Tobin, found the mass "concerning for neoplasm," which is "[a]n abnormal tissue that grows by cellular proliferation more rapidly than normal and continues to grow after the stimuli that initiated the new growth cease." (Id.); Stedman's Medical Dictionary, supra, at 1182. Dr. Tobin could not rule out a lung infection and thought there might also be an air-fluid level in Le's lungs. (Admin. R. at 176.)

At a return visit with Dr. Pham on July 11, 2003, Plaintiff complained of increased coughing, night sweats, fever, and coughing up blood, although he told the doctor he felt "better." (Id. at 158.) Dr. Pham reviewed the results of Le's chest x-ray, noted the lung mass and neoplasm, and opined that Plaintiff might be suffering from either pneumonia or tuberculosis. (Id.) The doctor prescribed Levaquin, an antibiotic, and ordered a computed tomogram (CT) scan of Le's chest. (Id.); A-Z Health Guides from WebMD: Drugs, Levaquin Oral, http://www.webmd.com/drugs/mono-8235 -LEVOFLOXACIN+-+ORAL. aspx (last visited Aug. 21, 2006).

The CT scan of Plaintiff's chest was performed, and the results interpreted by Dr. Rowena Tena on July 14, 2003. (Admin. R. at 167.) Dr. Tena found "[b]iapical scarring consistent with old granulomatous disease[, a] 3.5-cm, cavitary, left apical mass

with an air-fluid level[,] . . . [and an i]ndeterminate, 6-mm, lingular pulmonary nodule." (Id.)  Dr. Tena believed the left apical mass with an air-fluid level most likely represented reactivated tuberculosis, although it could also indicate a fungal superinfection or a neoplastic disease.  (Id.)  She recommended follow-up treatment for the mass, as well as for the 6-mm lesion, and she relayed her findings to Dr. Pham immediately.  (Id.)  After reviewing the results of the CT scan, Dr. Pham suspected tuberculosis and arranged for Plaintiff's admission to the hospital.  (Id. at 159.)

On July 14, 2003, Le was admitted to Scripps Mercy Hospital for tuberculosis evaluation and observation of any significant bleeding.  (Id. at 143, 168.)  Plaintiff denied any shortness of breath at the time of admission to the hospital.  (Id.)  Dr. Michael Sullivan evaluated Le upon intake and indicated his plan was to order a repeat chest x-ray and to check the CT of Plaintiff's chest, as well as a purified protein derivative and a test of Le's sputum for acid-fast bacilli ("AFB").  (Id. at 169); Davis, supra, at 18, 172.

Plaintiff checked into Scripps Mercy Hospital complaining of fever, chills, night sweats, weight loss (approximately seven pounds in the prior month), and coughing up phlegm mixed with streaks of blood during the two weeks prior to his hospital stay. (Admin. R. at 140.)  Le admitted smoking a pack of cigarettes a day for about twenty-eight years, but he told the doctor he quit in 1996.  (Id.)  Plaintiff had a slight fever upon admission, but he was in no acute distress.  (Id. at 141.)  Dr. Joseph Resnikoff evaluated Le's CT scan and found bifocal infiltrates with

bronchiectasis (chronic dilation of the bronchi) and subpleural blebs (small flaccid sacs under the lung membrane), which indicated the need to rule out an inflammatory disease like tuberculosis or a fungal infection. (Id.); Stedman's Medical Dictionary, supra, at 211, 243, 1694, 1933. Dr. Resnikoff's plan also included ruling out pneumonia, a possible bronchoscopy, and recommending a biopsy of Plaintiff's left upper lobe nodule. (Admin. R. at 141-42.)

A purified protein derivative given to Plaintiff tested positive for tuberculosis exposure. (Id. at 135); Davis, supra, at 172. The AFB sputum test, however, was negative. (Admin. R. at 135); Davis, supra, at 18. While in the hospital, Le underwent a bronchoscopy for evaluation of possible tuberculosis, which tested negative. (Admin. R. at 135.) A chest x-ray taken on July 17, 2003, revealed a moderate-sized left pneumothorax, but a follow-up x-ray taken on July 20, 2003, revealed the pneumothorax had diminished after Plaintiff received oxygen. (Id. at 136). Le was prescribed diphenhydramine, levofloxacin, and Vioxx and was instructed to follow up on the culture results for tuberculosis and a repeat chest x-ray. (Id. at 136.) If the findings on the x-ray were not resolved, Le would be considered for empiric tuberculosis therapy. (Id. at 135-36.) Plaintiff was instructed to resume all his previous activities. (Id. at 136.)

Le was seen by Dr. Pham again on July 23, 2003, at which time he was receiving treatment from Dr. Resnikoff, a pulmonologist. (Id. at 157.) Dr. Pham's notes for that day reveal that the doctor was apparently able to rule out tuberculosis, and Plaintiff was no longer coughing up blood. (Id. ("No hemoptysis")); Stedman's Medical Dictionary, supra, at 781 (defining "hemoptysis" as "[t]he

1  spitting of blood derived from the lungs or bronchial tubes").
2  This was the last visit Le had with Dr. Pham. (Admin. R. at 157,
3  164.)

4       Dr. Nadine Sidrick saw Le on August 7, 2003. (<u>Id.</u> at 195.)
5  Plaintiff complained that his body was "itchy" for "a long time,"
6  and he had been coughing with a clear phlegm for the last month.
7  (<u>Id.</u> at 195.)  Dr. Sidrick diagnosed Le with psoriasis, a lung
8  mass, and osteoarthritis. (<u>Id.</u> at 195.)  He was prescribed
9  Clarinix (an antihistamine for allergy relief). (<u>Id.</u>); A-Z Health
10 Guides from WebMD:  Drugs, Clarinix Oral, http://www.webmd.com/
11 drugs/mono-5324-DESLORATADINE+-+ORAL.aspx?drugid=22326&drugname=Cla
12 rinex+Oral (last visited on August 16, 2006).  Le reported on
13 August 14, 2003, that the Clarinix had worked, so his prescription
14 was renewed. (Admin. R. at 195.)  In a visit on November 21, 2003,
15 Plaintiff complained of pain to his left lung for "a long time"
16 with coughing and green phlegm during the previous two months.
17 (<u>Id.</u> at 194.)  Dr. Sidrick diagnosed Le with sinusitis and
18 psoriasis of the nails and scalp. (<u>Id.</u>)

19 **B.    Le's Mental Impairments**

20      **1.    Treating Doctors**

21           **a.    Dr. Henderson**

22      Dr. Harry C. Henderson, a psychiatrist, treated Plaintiff on
23 July 31, September 13, October 18, and December 13, 2003. (<u>Id.</u> at
24 180-83.)  Le reporting feeling hopeless, helpless, worthless, and
25 useless. (<u>Id.</u> at 182-83.)  Dr. Henderson also noted Plaintiff had
26 low energy, but was not suicidal. (<u>Id.</u>)  On November 19, 2004, Dr.
27 Henderson conducted a follow-up evaluation. (<u>Id.</u> at 293.)  The
28 doctor examined and interviewed Le with the assistance of an

interpreter and reviewed Plaintiff's medical records "consisting of Dr. Sidrick's treating notes, Dr. Ginsberg's notes, Scripps Mercy hospital notes, psychologist Dr. DiCicco's report and psychiatrist Dr. Engelhorn's psychiatric evaluation." (<u>Id.</u>)

Dr. Henderson stated, "[T]he patient continued to suffer severe depression and post-traumatic stress disorder dating from his refugee experiences in Vietnam and chronic obstructive pulmonary disease and status post tuberculosis that continue to bedevil him." (<u>Id.</u>)  The psychiatrist reported Le's "most severe impairment, however, results from chronic orthopedic pain and chronic obstructive pulmonary disease that end up causing him to be unable to work." (<u>Id.</u>)

Dr. Henderson administered the Raven's Standard Progressive Matrices test to Le. (<u>Id.</u> at 294.)  The test is considered culture-neutral, and the IQ obtained correlates with the Wechsler Adult Intelligence Scale ("WAIS") and Stanford-Binet IQ tests. (<u>Id.</u>)  Le scored an eighty-five on the test, indicating a low-average IQ. (<u>Id.</u> at 295.)  Plaintiff performed poorly on the WAIS test, and Dr. Henderson believed this was not due to malingering. (<u>Id.</u>)  The doctor noted that making an effort caused increased pain and anxiety for Plaintiff, thus drastically interfering with his short-term memory. (<u>Id.</u>)  Dr. Henderson diagnosed Le with recurrent major depression with psychotic features and chronic post-traumatic stress disorder. (<u>Id.</u> at 296.)  The doctor also noted previous diagnoses of chronic and throbbing headaches, chronic obstructive pulmonary disease, status post tuberculosis, lower back pain and degenerative discogenic disease of the lumbar spine, grade I retrolisthesis, and spinal instability. (<u>Id.</u>)  Dr.

Henderson approximated Le's Global Assessment of Functioning
("GAF") score at forty-five. (<u>Id.</u> at 296.)  A score between 41-50
indicates "serious symptoms" or "any serious impairment in social,
occupational, or school functioning (e.g., no friends, unable to
keep a job)." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL
OF MENTAL DISORDERS 34 (4th ed. Text Rev. 2000) (hereinafter "DSM-IV-
TR").  The GAF score may reflect an impairment that does not relate
to the ability to hold a particular job.

Dr. Henderson reported that Le's "mental disability is
permanent and stationary" and existed since the onset of his lung
problems in 2003.  (Admin. R. at 296.)  According to Dr. Henderson,
Plaintiff was depressed and unable to work. (<u>Id.</u>)  Le's depression
was worsened by his back and neck pain and difficulty breathing.
(<u>Id.</u>)  Dr. Henderson found Plaintiff had marked restrictions in
activities of daily living, marked difficulties in maintaining
social functioning, and frequent deficiencies of concentration,
persistence, or pace resulting in failure to complete tasks in a
timely manner in work settings or elsewhere. (<u>Id.</u>)  Furthermore,
"[h]is ability to adapt to stresses in the working environment
[was] severely limited and [was] not sustainable in the workplace."
(<u>Id.</u>)  The doctor felt these conditions combined "would prevent
[Le] from gainful employment [because] [h]e would not be able to
compete in the workplace and is in need of continued therapy."
(<u>Id.</u>)

After the ALJ's decision, Dr. Henderson conducted another
follow-up psychiatric evaluation of Le on July 12, 2005. (<u>Id.</u> at
317.)  The evaluation involved a review of Plaintiff's medical
records, hospitalization records for tuberculosis treatment,

psychiatric evaluation of Dr. Zappone, and Dr. Grisolia's
neurologic report.  (Id.)  The doctor's diagnosis was the same as
in 2004.  (Compare id. at 317, with id. at 293-96.)  Dr. Henderson
stated that during therapy sessions, Le consistently performed in
the "grossly deficient/severely disabled ranges."  (Id.)  He re-
diagnosed Le with recurrent major depression with psychotic
features and chronic post-traumatic stress disorder, but this time,
the doctor gave Plaintiff a lower GAF score of forty.  (Id.)  A
score between 31-40 indicates "some impairment in reality testing
or communication OR major impairment in several areas, such as work
or school, family relations, judgment, thinking, or mood."  DSM-IV-
TR, supra, at 34.

> **b.  Dr. Morgan**

Dr. Jacob R. Morgan, a cardiologist, completed a medical
history report on Le on November 1, 2004.  (Admin. R. at 23, 283.)
The report is not accompanied by any treatment records and without
any support in the administrative record, Le argues that Dr. Morgan
treated him for over three years.  (Id.; Pl.'s Mot. 20-21.)  Dr.
Morgan's report suggests that he did not examine Le; the doctor's
findings all begin with "I am told . . . ."  (Admin. R. at 283.)
Dr. Morgan unequivocally states only Le's weight, blood pressure,
and cardiovascular tests.  (Id. at 284.)

Dr. Morgan concluded that Plaintiff was very limited in his
residual functional capacity, suffers from severe depression and
post-traumatic stress syndrome, and should be restricted to
sedentary activities.  (Id.)  The doctor also found that Le had
marked restrictions in daily activities and social functioning, was
unable to concentrate or perform simple repetitive tasks, and was

1  unable to compete in the workforce.  (_Id._)  Dr. Morgan stated
2  Plaintiff was not vocationally capable in spite of the medications
3  Le was taking.  (_Id._)

   **c.  Dr. Zappone**

5       Dr. Ronald A. Zappone, a psychiatrist and neurologist, treated
6  Le before and after the administrative hearing on March 21, 2005.
7  (_Id._ at 285; Pl.'s Reply 7, Ex. A.)  On March 6, 2005, Dr. Zappone
8  diagnosed Le as having recurrent, severe major depression with
9  psychotic features, "[c]hest pain, asthma, history of tuberculosis
10 numbness and tingling in [the] hands[,] . . . [p]roblems related to
11 social environment and acculturation to a new country;
12 occupational, economic problems[,] . . . impairment in
13 communication; impairment in work and relationships, [and] mood
14 problems."  (Admin. R. at 286.)  He assessed Plaintiff's GAF at
15 forty-six.  (_Id._)

16      Dr. Zappone reported that Le "appeared very depressed and
17 anxious[,] . . . admitted hearing voices[,] . . . [and] had
18 difficulty concentrating."  (Admin. R. at 286.)  Le was oriented to
19 time, place, and person.  (_Id._)  Plaintiff, however, had problems
20 with memory, which were evidenced by an inability to "remember
21 three items after several minutes . . . to do digits forward or
22 backward . . .[or] to do serial 7s."  (_Id._)  Le's "affect was flat
23 and his mood was depressed."  (_Id._)  Dr. Zappone stated Le "had
24 suicidal ideation."  (_Id._)

25      The doctor found Le "had a marked inability to comprehend and
26 follow instructions . . . [and] a marked inability to perform
27 simple and repetitive tasks."  (_Id._)  He also found Plaintiff had a
28 "severe inability to perform complex and varied tasks[,] . . . to

13

relate to other people beyond giving and receiving instructions[,] . . . to influence people[,] . . . to make generalizations, evaluations and decisions without immediate supervision . . . [and] to accept and carry out responsibility for direction, control and planning." (<u>Id.</u> at 286-87.)  In Dr. Zappone's opinion, Le was permanently disabled but able to handle his own funds. (<u>Id.</u> at 287.)

Dr. Zappone's Psychiatric Review Technique form noted that Le had mental disorders that met the listing of impairments for 12.04 (affective disorders) and 12.06 (anxiety-related disorders). (<u>Id.</u> at 288.)  The doctor indicated Le showed signs of disturbance of mood accompanied by a full or partial manic or depressive syndrome as evidenced by anhedonia ("[a]bsence of pleasure from performance of acts that would ordinarily be pleasurable"), appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt, and difficulty concentrating or thinking.  (<u>Id.</u> at 288-89); <u>Stedman's Medical Dictionary</u>, <u>supra</u>, at 90.  The form also noted Plaintiff suffered from anxiety disorder as evidenced by motor tension, autonomic hyperactivity, apprehensive expectation, and vigilance and scanning.  (Admin. R. at 290.)  Dr. Zappone found Le had marked restrictions of activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace, and one or two episodes of deterioration (marked by a withdrawal from the situation or an exacerbation of signs or symptoms).  (<u>Id.</u> at 291.)  Furthermore, Plaintiff's 12.06 anxiety-related disorder resulted in complete inability to function independently outside of his home.  (<u>Id.</u> at 292.)

2.   **Examining Doctors**

a.   **Dr. Engelhorn**

On July 15, 2004, Dr. H. Douglas Engelhorn, a psychiatrist, examined Le.  (Id. at 235.)  No medical records were available to Dr. Engelhorn to review before the examination.  (Id.)  The doctor found Plaintiff alert, cooperative, and expressive.  (Id. at 236.) Dr. Engelhorn diagnosed Le as having an adjustment disorder with depressed mood, very mild possible psychotic disorder with visual hallucinations, recurrent skin rashes by history, and respiratory disease with possible tuberculosis by history.  (Id. at 237.)  The doctor estimated Le's current GAF at sixty-five to seventy, which indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, [with] some meaningful interpersonal relationships."  (Id.); DSM-IV-TR, supra, at 34.

Dr. Engelhorn found no evidence of active psychosis, severe depression or any significant levels of anxiety.  (Admin. R. at 236.)  He noted Le's concentration and attention seemed adequate, and his insight and judgment seemed intact though neither were formally tested.  (Id. at 237.)  The doctor also stated Plaintiff did not exhibit flat affect, psychomotor retardation, loosening of associations, delusions, or hallucinations.  (Id.)

Dr. Engelhorn reported that Le appeared "to have developed a reactive/adjustment type of depression," but had no suicidal tendencies.  (Id.)  He found Plaintiff's alleged hallucinations were not "particularly disabling" because they only occurred at

1   night and "may well be part of a dream state." (Id.) Plaintiff's

2   daily activities were within normal limits, and no cognitive

3   impairment was found. (Id.) From the doctor's "psychiatric point

4   of view, the patient is capable of doing simple, repetitive tasks"

5   but may have "considerable difficulty performing detailed and

6   complex work." (Id.) According to the doctor, Le's disability

7   "appear[ed] to be mostly related to his respiratory disease."

8   (Id.) Dr. Engelhorn also found Plaintiff could "adequately relate

9   to peers and supervisors in the workplace" and could "be expected

10  to make routine adjustments in the workplace." (Id.)

11              **b.   Dr. Grisolia**

12       On August 31, 2004, Dr. James Santiago Grisolia, a

13  neurologist, examined Le regarding complaints of a three-year

14  history of daily headaches. (Id. at 267.) The doctor found

15  Plaintiff to be alert and cooperative with minimal English skills.

16  (Id.) Dr. Grisolia's comprehensive neurologic examination was

17  "normal including cranial nerves, muscle strength, bulk and tone,

18  pin, vibration sense, muscle stretch reflexes, coordination, and

19  gait." (Id.) The doctor reported that Le's headaches seemed to be

20  triggered by his history of depression and insomnia; he concluded

21  the headache disorder "is of apparently disabling intensity."

22  (Id.)

23       After the ALJ's decision, Dr. Grisolia reevaluated Le on July

24  19, 2005. (Id. at 329.) The doctor attributed Plaintiff's

25  headaches to his severe depression. (Id.) The headaches also

26  caused lightheadedness, resulting in gait instability and

27  tiredness. (Id.) According to Dr. Grisolia, this lightheadedness

28  "makes it impossible for [Le] to move safely on [or] around

dangerous machinery where there is any falling danger." (<u>Id.</u>)  The
doctor stated Plaintiff's "headaches were dramatically improved
with the Depakote (a drug used to prevent migraine headaches and
other psychiatric disorders), but continued daily." (<u>Id.</u>); A-Z
Health Guides from WebMD:  Drugs, Depakote Oral http://www.webmd.
com/drugs/drug-1788-Depakote+Oral.aspx?drugid=1788&drugname=Depakot
e+Oral (last visited August 16, 2006).  He further reported Le was
"still severely depressed and he is disabled on this basis."
(Admin. R. at 329.)

       **c.   Dr. DiCicco**

    Dr. David A. DiCicco, a clinical psychologist, evaluated Le on
February 7, 2005. (<u>Id.</u> at 297.)  The doctor administered portions
of the Wechsler Adult Intelligence Scale-III ("WAIS-III") test
which were the least dependent on knowledge and use of the English
language. (<u>Id.</u> at 297-98.)  Dr. DiCicco also reviewed Plaintiff's
records and held a brief interview through an interpreter. (<u>Id.</u> at
297.)  Le's scores were in the average range, which indicates an
average IQ. (<u>Id.</u> at 298.)  Dr. DiCicco diagnosed Le with post-
traumatic stress disorder, major depression, problems with primary
support group and education, occupational problems, and problems
related to the social environment. (<u>Id.</u>)  The doctor assigned
Plaintiff a GAF score of fifty, the high end of the 41-50 range for
serious symptoms or serious impairments.  A GAF of 51-60, in
comparison, indicates moderate symptoms or impairments.  DSM-IV-TR,
<u>supra</u>, at 34.  The doctor further stated Le lacked energy, had
limited skills, suffered from a variety of physical symptoms, was
depressed, and was relatively isolated with few friends. (Admin.

17

R. at 298-99.)  Dr. DiCicco concluded: "It would be hard for this evaluator to see this patient working."  (Id. at 299.)

**3.   Nonexamining Doctors**

   **a.   Dr. Manolakas**

Dr. R. Manolakas completed a Physical Residual Functional Capacity Assessment for the SSA on February 27, 2004.  (Id. at 257-64.)  The doctor concluded that Plaintiff could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds. (Id. at 258.)  Le could sit, stand and walk about six hours in an eight-hour workday.  (Id.)  Dr. Manolakas also stated Plaintiff was not limited in his pushing or pulling capacity.  (Id.)  Le had no postural, manipulative, visual, or communicative limitations.  (Id. at 259-61.)  Plaintiff did have an environmental limitation to avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (Id. at 261.)  The doctor summarized that Le's "allegations regarding functional limitations based upon intensity and persistence of symptoms are given little weight, because there are material inconsistencies with other substantial evidence in file, and other medical and non-medical factors to consider."  (Id. at 262.)  He concluded the "severity or duration of [Le's] symptoms . . . is disproportionate to the expected severity or expected duration on the basis of the claimant's medically determinable impairment(s)."  (Id.)  Dr. Manolakas's assessment was affirmed by Dr. George G. Spellman.  (Id. at 264.)

   **b.   Dr. O'Malley**

On July 23, 2004, Dr. Edward O'Malley, a psychiatrist, completed a Mental Residual Functional Capacity Assessment for the SSA.  (Id. at 239-41.)  He found Le had a possible psychotic

disorder and adjustment disorder.  (Id. at 243, 245-46.)  According
to the doctor's assessment, Plaintiff was able to understand and
remember simple instructions; understand, remember and carry out
short and simple instructions on a consistent basis in a typical
work environment; interact appropriately with coworkers,
supervisors, and the general public; and adapt to changes in work
routine and location.  (Id. at 241.)  Dr. O'Malley found Le's
impairments caused mild restriction of activities of daily living,
moderate difficulties in maintaining social functioning, mild
difficulties in maintaining concentration, persistence, or pace,
with no episodes of decompensation.  (Id. at 253.)  The doctor
reported that, based on the medical evidence, Le "is able to
persist at simple tasks (unskilled work)."  (Id. at 241.)

### III. THE ADMINISTRATIVE HEARING

**A.   The Plaintiff's Testimony**

Le testified through an interpreter at the hearing before
Judge Carletti on March 21, 2005.  (Id. at 335-43, 358-60.)  He
said lung cancer or lung disease caused him to stop working.  (Id.
at 336, 339-40.)  Le stated he does not know if he still suffers
from lung disease, but he has been taking medication for a long
time.  (Id. at 336, 339-40.)  Plaintiff also testified that he
stopped working because of a combination of physical and mental
problems.  (Id. at 338.)  He takes several forms of medication that
seem to help ease his symptoms, but the medication makes it
difficult to wake up.  (Id. at 337.)

The ALJ questioned Le about his refusal to see Dr. Valet.
(Id. at 336-37.)  Le did not remember who told him to sign the form
stating he refused to see Dr. Valet, and he did not know whether he

was able to read it.  (Id. at 336.)  Plaintiff had no idea who Dr. Valet was, but he said that if the judge told him to see someone, he would follow the judge's instructions.  (Id. at 336-37.)

Le testified he can only walk "a little bit more than a block."  (Id. at 339.)  He also claimed sitting causes back pain so severe that he can only sit for limited amounts of time, and he can only lift five to ten pounds.  (Id. at 339.)  Plaintiff's back pain is constant and requires him to roll out of bed, rather than sitting up in the morning.  (Id. at 341-43.)  Le also experiences neck pain two to three times a day that makes him unable to rotate his neck.  (Id. at 341-42.)  After taking medication and lying down, the neck pain subsides within "a little over an hour."  (Id.) Plaintiff takes medication for his back pain at night as well. (Id. at 342.)  The medication causes dizziness and sleepiness. (Id. at 343.)

Le testified that before he was admitted to the hospital on July 14, 2003, he had difficulty breathing and would cough up blood.  (Id. at 340.)  He tried to return to work after being discharged from the hospital but was unable to perform the job because he still had difficulty breathing.  (Id.)

Plaintiff claimed his emotional problems started long before his physical problems, and when his wife left him to raise four children alone, Le's emotional problems worsened.  (Id. at 339-40.) Plaintiff's condition has become even worse since Le stopped working because he has no energy, worries about his four children, and frequently feels ill.  (Id. at 343.)

Plaintiff has trouble sleeping, but he takes medication to help him sleep.  (Id.)  The medication prevents Le from driving.

1  (Id. at 359.)  Plaintiff testified that his former newspaper

2  delivery job required three to four hours of walking per day and

3  one to two hours of driving per day.  (Id. at 359.)  But in a

4  signed disability report submitted to the Social Security

5  Administration, Le stated the job required six hours of walking,

6  two hours of standing, and lifting up to five pounds.  (Id. at

7  358.)

8  **B.    The Medical Expert's Testimony**

9       Sidney Bolter, M.D., a board-certified psychiatrist, testified

10  at the hearing as a medical expert.  (Id. at 60, 344, 349-50, 352-

11  54.)  Dr. Bolter did not treat or examine Plaintiff but reviewed

12  most of Le's medical reports before testifying.  (Id. at 344.)  He

13  testified that Dr. Henderson's and Dr. Engelhorn's reports were

14  complete.  (Id. at 352.)

15       Dr. Bolter agreed with Dr. Engelhorn's report and opined that

16  Le's diagnoses would include adjustment disorder with depressed

17  mood under listing 12.04.  (Id.)  The medical expert placed Le in

18  the moderately limited range for social functioning and in the

19  mildly limited range for concentration, persistence, and pace.

20  (Id. at 353.)  He believed the limits on Plaintiff's social

21  functioning had more to do with his physical condition than any

22  mental or emotional problems.  (Id.)  The doctor estimated Le's

23  impairments to be "mild for simple repetitive tasks, non-public

24  environment, and minimal contact with peers and supervisors, [with]

25  one to two [episodes of] decompensation."  (Id. at 354.)

26       Dr. Bolter also noted Plaintiff's severe lung problems and

27  testified that Le's disability "hinges on the lung disease, not on

28  psychiatric diagnosis."  (Id. at 352.)  But Dr. Bolter did not

comment on Plaintiff's respiratory ailments because he is not a specialist in that area.  (Id. at 354.)

## C.   **The Vocational Expert's Testimony**

Bonnie Sinclair testified as a vocational expert.  (Id. at 348, 354-58, 360.)  Sinclair stated that Le's past work as a newspaper delivery person was unskilled, light work with a specific vocational preparation level ("SVP") of two.  (Id. at 348); see also 1 U.S. DEPT. OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES 232 (4th ed., rev. 1991) (hereinafter "DOT") (defining Newspaper Carrier under Occupational Group Arrangement No. 292.457-010).  She opined that if Plaintiff is limited to light, unskilled, simple repetitive tasks with minimal to no public contact, he could still perform his past work.  (Admin. R. at 355.)

If Le is unable to walk six hours a day, Plaintiff would be unable to perform the newspaper delivery job.  (Id. at 360.)  If he is unable to drive two hours a day, Le would also be unable to perform his past work.  (Id.)  The vocational expert could not express an opinion regarding whether driving was a simple, repetitive task or a more complex task.  (Id. at 357-58.)  She stated this issue was "really relatively subjective[,]" depending on whether Plaintiff drove on a freeway or suburban side streets and whether he drove the same route every day or different routes, among other variables.  (Id. at 358.)

### IV. THE ALJ'S DECISION

In his decision, the ALJ recounted Plaintiff's medical, work, and educational history, as well as the evidence presented at the administrative hearing.  (Id. at 16-26.)  Judge Carletti then made the following findings:

1.   The claimant met the disability insured status requirements of the Act on July 1, 2003, the date the claimant stated he became unable to work, and continues to meet them through the date of this decision.

2.   The claimant has not engaged in substantial gainful activity since July 1, 2003.

3.   The medical evidence establishes that the claimant has severe pulmonary disease, arthritis, dermatitis, and adjustment disorder, but that he does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.   Pursuant to the law of the Ninth Circuit Court of Appeals, Social Security Rulings 96-3p, 96-4p, and 96-7p, and pertinent regulations, the claimant's allegations of the degree of his impairments and limitations are rejected as not credible.

5.   The claimant has the residual functional capacity to perform light work.  He is able to lift and/or carry ten pounds frequently and twenty pounds occasionally, sit, stand and/or walk six hours per eight hour workday, and must avoid concentrated exposure to lung irritants.  The claimant is able to understand, remember, and carry out simple instructions on a consistent basis.  The claimant is able to perform simple repetitive tasks.  The claimant is able to interact appropriately with others in the workplace.  The claimant is able to adapt to changes in work routine and work location. The claimant is able to make routine adjustments in the workplace.  The claimant is able to respond appropriately to usual work situations (20 CFR §§ 404.1545 and 416.945).

6.   The claimant's past relevant work as newspaper delivery person, as actually performed, did not require the performance of work-related activities precluded by the above limitation(s) (20 CFR §§ 404.1565 and 416.965).

7.   The claimant's impairments [do] not prevent the claimant from performing his past relevant work.

8.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR §§ 404.1520(c) and 416.920(c)).

1  (Id. at 26-27.)  Based on all of the above, Judge Carletti

2  concluded that Le is not entitled to a period of disability or

3  disability insurance benefits or supplemental security income.

4  (Id. at 27.)

5                        **V.   STANDARD OF REVIEW**

6       To qualify for disability benefits under the Social Security

7  Act, an applicant must show that:  (1) He or she suffers from a

8  medically determinable impairment that can be expected to last for

9  a continuous period of twelve months or more or result in death;

10 and (2) the impairment renders the applicant incapable of

11 performing the work that he or she previously performed or any

12 other substantially gainful employment that exists in the national

13 economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West Supp.

14 2005).  An applicant must meet both requirements to be classified

15 as "disabled."  Id.

16      Sections 205(g) and 1631(c)(3) of the Social Security Act

17 allow applicants whose claims have been denied by the SSA to seek

18 judicial review of the Commissioner's final agency decision.  42

19 U.S.C.A. §§ 405(g), 1383(c)(3) (West Supp. 2005).  The court should

20 affirm the Commissioner's decision unless "it is based upon legal

21 error or is not supported by substantial evidence."  Bayliss v.

22 Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell

23 v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)).

24      Substantial evidence is "such relevant evidence as a

25 reasonable mind might accept as adequate to support [the ALJ's]

26 conclusion[,]" considering the record as a whole.  Webb v.

27 Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (citing Richardson v.

28 Perales, 402 U.S. 389, 401 (1971)).  It means "'more than a mere

scintilla but less than a preponderance'" of the evidence. Bayliss, 427 F.3d at 1214 n.1 (quoting Tidwell, 161 F.3d at 601). "'[T]he court must consider the evidence that supports and the evidence that detracts from the ALJ's conclusion.'" Frost v. Barnhart, 314 F.3d. 359, 366-67 (9th Cir. 2002) (quoting Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985), and citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-488 (1951); Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001)).

To determine whether a claimant is "disabled," the Social Security regulations use a five-step process outlined in 20 C.F.R. § 404.1520. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. Ukolov v. Barnhart, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 974 (9th Cir. 2000)). Although the ALJ must assist the applicant in developing a record, the applicant bears the burden of proof during the first four steps. Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999). If the fifth step is reached, however, the burden shifts to the Commissioner. Id. at 1098. The steps for evaluating a claim are:

> **Step 1.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two.

> **Step 2.** Is the claimant's impairment severe? If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three.

**Step 3.** Does the impairment "meet or equal" one of a list of specific impairments described in the regulations? If so, the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits. If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four.

**Step 4.** Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "<u>not disabled</u>" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step.

**Step 5.** Is the claimant able to do any other work? If not, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits. If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "<u>not disabled</u>" and therefore not entitled to disability insurance benefits. If the Commissioner cannot meet this burden, then the claimant is "<u>disabled</u>" and therefore entitled to disability benefits.

<u>Id.</u> at 1098-99 (footnotes and citations omitted); <u>see also</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 954 (9th Cir. 2001) (giving an abbreviated version of the five steps).

Section 405(g) permits this Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision. 42 U.S.C.A. § 405(g) (West Supp. 2006). The matter may also be remanded to the Social Security Administrator for further proceedings. <u>Id.</u>

**VI. DISCUSSION**

**A.   The ALJ Properly Rejected the Opinions of Plaintiff's Treating**
**Physicians in Favor of Examining Physicians Dr. Engelhorn and**
**Dr. O'Malley and Nonexamining Medical Expert Dr. Bolter.**

Plaintiff contends Judge Carletti improperly rejected treating doctors' opinions and instead relied on nontreating physicians' opinions without giving specific, legitimate reasons.  (Pl.'s Mem. 1, 18-25.)  A treating physician's opinion must be accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] case record . . . ."  20 C.F.R. § 404.1527(d)(2) (West 2006).  If the treating physician's opinion is not given controlling weight, the following factors are applied in determining what weight to give the opinion:  (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the treating physician, and (6) any other factors brought to the attention of the ALJ which tend to support or contradict the opinion.  Id. §§ 404.1527(d)(2)(i)-(ii), (d)(3)-(6).

"Cases in [the Ninth Circuit] distinguish among the opinions of three types of physicians:  (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

1     Opinions of treating physicians may only be rejected under

2  certain circumstances.  See Batson v. Comm'r of Soc. Sec. Admin.,

3  359 F.3d 1190, 1195 (9th Cir. 2004).  "[W]here the treating

4  doctor's opinion is not contradicted by another doctor, it may be

5  rejected only for 'clear and convincing' reasons."  Lester, 81 F.3d

6  at 830 (citing Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir.

7  1991)); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.

8  2002).  "Even if the treating doctor's opinion is contradicted by

9  another doctor, the Commissioner may not reject this opinion

10  without providing 'specific and legitimate reasons' supported by

11  substantial evidence in the record . . . ."  Lester, 81 F.3d at 830

12  (citing Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983)).

13     Similarly, the opinion of an examining doctor is entitled to

14  greater weight than that of a nonexamining doctor.  Id. (citing

15  Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990); Gallant v.

16  Heckler, 753 F.2d 1450 (9th Cir. 1984)).  "In addition, the

17  regulations give more weight to opinions that are explained than to

18  those that are not, and to the opinions of specialists concerning

19  matters relating to their specialty over that of nonspecialists."

20  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001) (citing

21  20 C.F.R. §§ 404.1527(d)(3), (5)).  An ALJ must provide clear and

22  convincing reasons for rejecting the uncontradicted opinion of an

23  examining physician, and even when the examining physician's

24  opinion is contradicted by another doctor, the opinion may only be

25  rejected for specific and legitimate reasons that are supported by

26  substantial evidence.  Lester, 81 F.3d at 830-31.

27     "The opinion of a nonexamining physician cannot by itself

28  constitute substantial evidence that justifies the rejection of the

opinion of either an examining <u>or</u> a treating physician." <u>Id.</u> at 831 (citing <u>Pitzer</u>, 908 F.2d at 506 n.4; <u>Gallant</u>, 753 F.2d at 1456)). "[T]he report of a non-treating, non-examining physician, combined with the ALJ's own observance of the claimant's demeanor at the hearing d[oes] not constitute substantial evidence" and does not support an ALJ's "decision to reject the examining physician's opinion that the claimant [is] disabled." <u>Id.</u> (quoting <u>Gallant</u>, 753 F.2d at 1456) (internal quotation marks omitted).

This does not mean that an ALJ may never reject a treating or examining physician's opinion in favor of a nonexamining medical expert's testimony. "[T]he findings of a nontreating, nonexamining physician can amount to substantial evidence, so long as other evidence in the record supports those findings." <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996). The nonexamining physician's opinion must be "supported by other evidence in the record and consistent with it." <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir. 1999).

> When a nontreating physician's opinion contradicts that of the treating physician - but is not based on independent clinical findings, or rests on clinical findings also considered by the treating physician - the opinion of the treating physician may be rejected only if the ALJ gives specific, legitimate reasons for doing so that are based on substantial evidence in the record.

<u>Id.</u> (citing <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755 (9th Cir. 1989)) (internal quotation marks omitted).

The ALJ must set out a "detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Id.</u> at 600-01 (quoting <u>Magallanes</u>, 881 F.2d at 750). The ALJ is not required to discuss each item of

evidence, but the record should indicate that all evidence presented was considered.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000); Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996).  "[A]n ALJ may not make 'speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion."  Morales v. Apfel, 225 F.3d 310, 317-18 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999), and citing Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Kent v. Schweiker, 710 F.2d 110, 115 (3d Cir. 1983)).  "Further, an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings . . . ."  Batson, 359 F.3d at 1195 (citing Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)).

The reviewing court must "consider the record as a whole, weighing both evidence that supports and evidence that detracts from the Secretary's conclusion."  Id. (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)).

In this case, Le complains that the ALJ improperly rejected the opinions of five treating physicians:  Dr. Henderson, Dr. Zappone, Dr. Grisolia, Dr. Morgan, and Dr. Sidrick.  (Pl.'s Mem. 18-21.)  The ALJ is not obligated to accept or reject the opinion of a treating physician in full.  Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994).  The ALJ "may properly accept some parts of the medical evidence and reject other parts, but [the ALJ] must

consider all the evidence and give some reason for discounting the evidence [he] rejects."   Id.

The opinions of Dr. Henderson, Dr. Zappone, and Dr. Grisolia were contradicted by examining psychiatrists Dr. Engelhorn and Dr. O'Malley and medical expert Dr. Bolter.  (Compare Admin. R. at 235-38, 243-56, 352-54, with Admin. R. at 267, 285-99, 317-21.)  Dr. Morgan's and Dr. Sidrick's opinions regarding pulmonary ailments were contradicted by Dr. Resnikoff, and any opinions they may have formed regarding whether Plaintiff was disabled because of depression and post-traumatic stress disorder were contradicted by Drs. Engelhorn, O'Malley, and Bolter.  (Compare id. at 184-85, 276-84, with id. at 188-89, 201-16; compare id. at 184-85, 276-84, with id. at 267, 285-99, 317-21; see also Pl.'s Mem. 20-21 (arguing Judge Carletti improperly rejected the opinions of Drs. Morgan and Sidrick regarding Le's depression and post-traumatic stress syndrome).)  Thus, although clear and convincing reasons for disregarding the contradicted opinions of Le's treating and examining physicians were not required, the ALJ must give specific, legitimate reasons, supported by substantial evidence in the record.  See Batson, 359 F.3d at 1195; Tonapetyan, 242 F.3d at 1148; Lester, 81 F.3d at 830.

Judge Carletti summarized the contradicting reports in his decision.  (Admin. R. at 18-25.)  The ALJ accorded little weight to the opinions of Drs. Sidrick, Grisolia, Morgan, Zappone, and Henderson based on their prior inconsistent submissions.  (Id. at 20, 22-24.)

Judge Carletti took administrative notice of the numerous disability claims before him filed by Attorney Manbeck that

involved claimants whom she had sent to the same doctors.  (Id. at 17.)  In those prior cases, "the above referenced physicians and psychologist[s] . . . routinely set forth medical source statements purporting significant and/or debilitating impairments and limitations in a manner at odds with the remaining evidence of record from practitioners to whom a claimant was not referred by Attorney Manbeck."  (Id.)  An ALJ "may not assume doctors routinely lie to help their patients collect disability benefits.  [But,] may introduce evidence of actual impropriety[.]"  Lester, 81 F.3d at 832 (quoting Ratto v. Sec'y of Health & Human Servs., 839 F. Supp. 1415, 1426 (D. Or. 1993)).  Thus, Judge Carletti needed specific reasons for rejecting the doctors' opinions in this case.

### 1.   Dr. Sidrick

Plaintiff argues the ALJ improperly rejected Dr. Sidrick's assessment of Le's depression and post-traumatic stress disorder. (Pl.'s Mem. 20-21.)  Plaintiff contends that "[u]nder Ninth Circuit law, Dr. Sidrick's . . . opinion may not be disregarded on the grounds that [she is] not [a] psychiatrist[]."  (Id. at 21.)  Le asserts that Dr. Sidrick expressed an opinion regarding the combined impact of both Plaintiff's physical and mental limitations and that her opinion should be accorded controlling weight as the opinion of a treating physician.  (Id.)

The ALJ attributed less weight to Dr. Sidrick's opinion because (1) she was a general practitioner and not a lung specialist; (2) neither her treatment notes nor the record reflects that Plaintiff would be unable to work for twelve months or more; (3) her opinion was not supported by objective, longitudinal medical evidence of record; (4) her opinion was not consistent with

32

that of the lung specialist Dr. Resnikoff, who was treating the Plaintiff; and (5) she opined on matters reserved to the Commissioner.  (Admin. R. at 20-21.)

The ALJ first limited the weight of Dr. Sidrick's opinion concerning Le's lung condition because she is not a lung specialist.  (Id. at 20.)  The courts "generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."  20 C.F.R. § 416.927(d)(5); see also Holohan, 246 F.3d at 1202 (citing 20 C.F.R. § 404.1527(d)(5)).  Dr. Sidrick is a general practitioner; this is a legitimate reason for giving less weight to her opinion regarding Le's lung condition than given to the opinion of a lung specialist.

Second, Dr. Sidrick did not opine that Plaintiff's impairments would continue for more than twelve months.  (Admin. R. at 20-21.) To be found disabled, a claimant's impairments must "be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  None of Dr. Sidrick's treatment notes indicate Le's impairments would be expected to last more than twelve months.  (See Admin. R. at 193-95, 276-81.)  On the Authorization to Release Medical Information form, Dr. Sidrick indicated Le had an "acute" condition that began in July of 2003 and was expected to last until February of 2004.  (Id. at 184.) This is only eight months and does not meet the twelve month requirement.  See 42 U.S.C.A. § 423(d)(1)(A) (West Supp. 2006). This is a specific and legitimate reason to limit the weight of Dr. Sidrick's opinion.  See Shiver v. Chater, No. 94-0918-P-S, 1996 U.S. Dist. LEXIS 7336, at *37 (S.D. Ala. Mar. 14, 1996) (rejecting

1  treating doctor's opinion because it lacked evidence that

2  disability met the durational requirement).

3       The third reason Judge Carletti discounted Dr. Sidrick's

4  opinion is that it is not supported by longitudinal objective

5  medical evidence.  (Id. at 20.)  The ALJ noted that although Dr.

6  Sidrick diagnosed Le with osteoarthritis, "[a] comprehensive

7  orthopedic examination was not performed."  (Id. at 21.)

8  Additionally, no laboratory tests were done on Plaintiff's spine,

9  despite Le's complaints of back and neck pain.  (Id.)  Indeed, the

10  doctor's treatment notes do not contain the results of any

11  objective tests that would support her diagnosis.  (See id. at 276-

12  81.)  Dr. Sidrick stated that Le had a lung mass that made him

13  unable to work; yet, on November 21, 2003, she reported that his

14  lungs were clear.  (Id. at 20-21, 194.)  Her treatment notes on

15  March 5, 2004, indicate Plaintiff had increased lung sounds, but

16  otherwise her records do not contain objective evidence of tests

17  performed on Le's lungs.  The lack of objective medical findings to

18  support Dr. Sidrick's diagnoses is a specific and legitimate reason

19  for the ALJ to limit the weight of her opinion.  See Batson, 359

20  F.3d at 1195.

21       The ALJ noted that Dr. Sidrick's opinion was not shared by Dr.

22  Resnikoff, the lung specialist.  (Id. at 20-21.)  In Plaintiff's

23  July 21, 2003, discharge summary from Scripps Hospital, after the

24  surgery performed by Dr. Resnikoff, Le was instructed by Dr. Dahms

25  to resume all previous activities as tolerated.  (Id. at 136.)  Dr.

26  Sidrick, on the other hand, assessed Le with a lung mass in 2004,

27  but she still found that Plaintiff's lungs were "normal."  (Id. at

28

1  276-82.)  This discrepancy provides specific and legitimate reason
2  to discredit Dr. Sidrick's opinion.

3       As a fifth reason for limiting the weight of Dr. Sidrick's
4  opinion, the ALJ states she opined on matters reserved for the
5  Commissioner.  (<u>Id.</u> at 21.)  On the Authorization to Release
6  Medical Information form, the doctor indicated Le would be unable
7  to work.  (<u>Id.</u> at 184.)  The claimant's ability to work is a matter
8  reserved for the Commissioner and is a specific and legitimate
9  reason for disregarding Dr. Sidrick's conclusion.  <u>See</u> 20 C.F.R. §
10 404.1527(e)(1).

11      On the whole, the ALJ provided specific, legitimate reasons
12 supported by the record for the limiting the weight of Dr.
13 Sidrick's opinion.

14      **2.  Dr. Grisolia**

15      The ALJ assigned little weight to Dr. Grisolia's psychiatric
16 opinion because the doctor (1) did not provide treatment notes, (2)
17 did not discuss the duration of Le's depression, (3) did not set
18 forth any laboratory findings, (4) did not set forth an opinion of
19 specific work-related limitations, and (5) equivocally stated that
20 the Plaintiff's purported headaches were "apparently disabling."
21 (<u>Id.</u> at 22.)  The ALJ also discounted Dr. Grisolia's opinion that
22 Le's daily headache disorder was "apparently disabling" because the
23 alleged three-year history of headaches did not affect Plaintiff's
24 prior work history, and Le denied having headaches to other
25 doctors.  (<u>Id.</u>)

26      The ALJ's first and third reasons for limiting the weight of
27 Dr. Grisolia's opinion correctly state that Dr. Grisolia submitted
28 only a one-page letter with no treatment notes and no laboratory

findings.  (See id. at 22, 267.)  "[A]n ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole, or by objective medical findings."  Batson, 359 F.3d at 1195 (citing Matney, 981 F.2d at 1019; Tonapetyan, 242 F.3d at 1149).  This is a legitimate reason to disregard a physician's opinion, especially because there is no indication that Dr. Grisolia created any treatment notes.  See Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (citing Tonapetyan, 242 F.3d at 1150) (requiring further development of the record only when the evidence is ambiguous, the ALJ finds the record is inadequate to make a disability determination, or the ALJ relies on a medical expert who finds the record ambiguous).

The ALJ's second, fourth, and fifth reasons to accord little weight to Dr. Grisolia's opinion were that the doctor did not discuss the duration of Le's impairments or their functional limitations and was "equivocal" in making his findings.  (Admin. R. at 22.)  The doctor stated that Plaintiff's headaches are "of apparently disabling intensity."  (Id. at 267 (emphasis added).)  Other than his statement that Le's daily headaches require that he lay down, the doctor gave no indication of how the headaches or depression interfere with Le's ability to work.  (See id.)  Dr. Grisolia also commented that Le's symptoms would be "refractory because of concomitant depression" indicating they would be resistant to treatment.  (Id. at 267.)  This finding does not address whether Plaintiff's depression-related headaches could be expected to last more than a year, and the doctor did not make any other assertions regarding the likely severity or duration of Plaintiff's ailments.  See id.; see also 42 U.S.C. § 423(d)(1)(A).

These are specific and legitimate reasons to give less weight to Dr. Grisolia's opinion. See 20 C.F.R. § 404.1505(a) (medically-determinable disabling impairment must last or be expected to last more than twelve months); Garner v. Shalala, No. 93-0665-BH-S, 1994 U.S. Dist. LEXIS 19351, at *24-25 (S.D. Ala. Nov. 9, 1994) (finding doctor's failure to restrict claimant from performing any specific activity a legitimate reason to reject the physician's opinion); Clark v. Bowen, 668 F. Supp. 1357, 1361 (N.D. Cal. 1987) (upholding ALJ's rejection of physician's equivocal opinion of disability that was brief, conclusory, and unsupported by clinical findings).

Judge Carletti also noted that the alleged headache disorder did not inhibit Le's ability to work "prior to his being laid off." (Admin. R. at 22.) On August 31, 2004, Le reported a three-year history of headaches. (Id. at 267.) But, the alleged onset date of Le's disability was July 1, 2003. (Id. at 16.) Plaintiff, therefore, worked for nearly two years while experiencing allegedly "disabling" headaches. This contradiction provides another legitimate reason to limit the weight given to Dr. Grisolia's opinion. Cf. Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005) (finding evidence that claimant worked five-hour shifts contradicted physician's opinion that she could only work for two hours a day provided a legitimate reason to discredit the physician's opinion).

All of the ALJ's reasons for giving less weight to Dr. Grisolia's opinion are specific, legitimate, and supported by the record evidence at the time of Judge Carletti's decision. The evidence submitted less than one month after the ALJ's decision, a letter from Dr. Grisolia dated July 19, 2005, presents essentially

the same opinion the doctor gave before.  (<u>See</u> Admin. R. at 329.)
Dr. Grisolia's letter does not cannot change the analysis.  Judge
Carletti's decision to give little weight to Dr. Grisolia's opinion
regarding Le's headaches and depression should be upheld.

### 3.   Dr. Morgan

Le argues the ALJ improperly rejected Dr. Morgan's assessment
of his depression and post-traumatic stress disorder.  (Pl.'s Mem.
20-21.)  Plaintiff contends that "[u]nder Ninth Circuit law, . . .
Dr. Morgan's opinion may not be disregarded on the grounds that [he
is] not [a] psychiatrist[]."  (<u>Id.</u> at 21 (citing <u>Sprague</u>, 812 F.2d
at 1231; <u>Lester</u>, 81 F.3d at 829).)  Le further asserts that Dr.
Morgan's opinion regarding the combined impact of both Plaintiff's
physical and mental limitations should be accorded controlling
weight as the opinion of a treating physician.  (<u>Id.</u>)

Judge Carletti's reasons for attributing little weight to Dr.
Morgan's opinion are the following:  (1) None of the impairments
Dr. Morgan discussed relate to his specialty as a cardiologist or
matters for which he treated Le; (2) all of Dr. Morgan's statements
are conclusory and based on either Plaintiff's self-report or his
attorney's report and begin with "I am told that"; (3) Dr. Morgan
provided no treatment notes; and (4) Dr. Morgan opined on matters
reserved to the Commissioner.  (Admin. R. at 23.)

The ALJ's first reason for discrediting Dr. Morgan's opinion
concerning Le's mental condition is that he is not a psychiatrist.
(<u>Id.</u> at 23.)  The courts "generally give more weight to the opinion
of a specialist about medical issues related to his or her area of
specialty than to the opinion of a source who is not a specialist."
20 C.F.R. § 416.927(d)(5).  Dr. Morgan is a cardiologist but his

opinion does not address Le's heart condition; instead it addresses
Le's back, lung, and mental conditions.  (See Admin. R. at 283-84.)
These facts are legitimate reasons to give less weight to Dr.
Morgan's opinion regarding Le's mental condition.  See Holohan, 246
F.3d at 1202 (citing 20 C.F.R. § 404.1527(d)(5)).  But see Sprague
v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987) (concluding that
psychiatric evidence may be found in a primary care physician's
treatment notes and opinions).

Second, Judge Carletti discounted Dr. Morgan's opinion because
it was conclusory.  (Admin. R. at 23.)  Dr. Morgan stated that
Plaintiff was his patient, but he repeatedly states that he was
"told" of Le's various ailments.  (See id. at 283-84.)  The doctor
did not include any treatment notes.  (See id.)  Furthermore, he
did not perform any objective tests regarding Le's mental
impairments.  (See id.)  "[A]n ALJ may discredit treating
physicians' opinions that are conclusory, brief, and unsupported by
the record as a whole, or by objective medical findings." Batson,
359 F.3d at 1195 (citing Matney, 981 F.2d at 1019; Tonapetyan, 242
F.3d at 1149).

Plaintiff belatedly submitted treatment notes to support Dr.
Morgan's assessment.  With his Memorandum of Points and
Authorities, filed February 10, 2006, Plaintiff attached one page
of treatment notes from Dr. Morgan, spanning the period from August
11, 2003, through November 21, 2005.  (Pl.'s Mem. Ex. A.)  Other
than the first paragraph of Dr. Morgan's newly submitted treatment
notes, the rest of the page contains one-line entries primarily
listing Le's weight and blood pressure; no other diagnosis is
apparent from the entries.  (Id.)  The exhibit does not explain how

the cardiologist learned the information in his November 1, 2004, assessment, nor does it provide any greater detail regarding how he was able to diagnose orthopedic, pulmonary, and emotional problems. (See id.; Admin. R. at 23.)

"A reviewing court may remand a case to the Secretary for consideration of new evidence where: (1) the new evidence is material; and (2) good cause exists for the claimant's failure to incorporate the evidence in a prior proceeding." Cotton v. Bowen, 799 F.2d 1403, 1409 (9th Cir. 1986) (citing 42 U.S.C. § 405(g); Key v. Heckler, 754 F.2d 1545, 1551 (9th Cir. 1985)); see also Mayes, 276 F.3d at 462. "To be material, the new evidence must bear directly and substantially on the matter in issue" and have a reasonable possibility of changing the outcome. Cotton, 799 F.2d at 1409 (citing Key, 754 F.2d at 1551; Booz v. Sec'y of Health and Human Servs., 734 F.2d 1378, 1380-81 (9th Cir. 1984)). "To show good cause, the claimant must establish that she could not have obtained the evidence at the time of the administrative proceeding." Cotton, 799 F.2d at 1409 (citing Key, 754 F.2d at 1551).

The new treatment notes from Dr. Morgan do not "bear 'directly and substantially on the matter in dispute.'" Mayes, 276 F.3d at 462 (quoting Ward v. Schweiker, 686 F.2d 762, 764 (9th Cir. 1982)). Nor does the submission of this single page have a reasonable probability of changing the outcome at the administrative hearing. See id.; (Pl.'s Mem. Ex. A). Although the tardy submission addresses one of the ALJ's criticisms of Dr. Morgan's opinion, Plaintiff does not show why this evidence could not have been obtained earlier. (See Pl.'s Mem. 1-25.) Absent materiality and

40

good cause, this new evidence cannot be considered by this Court in deciding whether to affirm the ALJ's decision.  <u>Cotton</u>, 799 F.2d at 1409.

Finally, the ALJ discredits Dr. Morgan for opining on matters reserved to the Commissioner.  (Admin. R. at 23.)  Dr. Morgan stated Le "is not considered vocationally capable."  (<u>Id.</u> at 284.) This is a finding reserved for the Commissioner.  <u>See</u> 20 C.F.R. § 404.1527(e)(1).

The ALJ's decision to attribute little weight to Dr. Morgan's opinion is supported by specific and legitimate reasons; it should be affirmed.

**4.   Dr. Zappone**

The ALJ found Dr. Zappone's opinion was "not entitled to significant weight" for the following reasons:  (1) The doctor's diagnosis that Le satisfied the "C" criteria of the 12.06 listing (anxiety disorder) was inconsistent with Le's allegations; (2) his report was inconsistent with his Psychiatric Review Technique form; (3) Dr. Zappone "performed a limited mental status examination and did not perform objective testing[;]" (4) no treating records were provided; (5) the doctor did not state Plaintiff responded to internal stimuli; (6) he opined on matters reserved for the Commissioner; (7) he did not assess insight and judgment; (8) the opinion was conclusory; (9) the opinion was not supported by longitudinal objective evidence of record; and (10) it was unclear when signs and symptoms commenced or if they would remain for the requisite period.  (Admin. R. at 23-24.)

Judge Carletti faults Dr. Zappone's opinion for diagnosing Le with "C" criteria of the 12.06 (anxiety disorder) listings.  (<u>Id.</u>

at 23.)   Anxiety disorder includes symptoms "[r]esulting in
complete inability to function independently outside the area of
one's home," but the ALJ asserted that "the claimant himself does
not allege complete inability to function independently outside his
home." (<u>Id.</u> at 23, 292); 20 C.F.R. § 404 App. 1 to Subpart P
12.06.  Dr. Zappone found the "C" criteria of a 12.06 listing
present.  (Admin. R. at 292.)  The doctor's report states that Le
has a severe inability to perform in the workplace, relate to other
people, make decisions, and carry out responsibility for direction,
control, and planning.  (<u>Id.</u> at 286-87.)  Le did not allege any
mental conditions in his Request for Hearing by an ALJ.  (<u>See id.</u>
at 45.)  But Plaintiff did claim to suffer from "nightmares, memory
loss, anxiety, and depression" in his December 2003 disability
application.  (<u>Id.</u> at 71.)  Le also testified that he stopped
working because of a combination of mental and physical problems.
(<u>Id.</u> at 338.)  Judge Carletti's first reason is not a legitimate
reason for discrediting Dr. Zappone because it is not supported by
the record.

     The ALJ further noted inconsistencies in Dr. Zappone's
diagnosis.  (<u>Id.</u> at 23.)  The doctor stated that Le "appeared very
depressed and anxious" and that "he has auditory hallucinations
. . . ."  (<u>Id.</u> at 286.)  Dr. Zappone diagnosed Le with recurrent
and severe major depression with psychotic features.  (<u>Id.</u> at 286.)
On his Psychiatric Review Technique form, however, the doctor did
not indicate that any psychotic disorders were present.  (<u>Id.</u> 288.)
The doctor did mark that anxiety-related disorders were present,
but his diagnoses did not include any anxiety disorders.  (<u>Compare</u>
<u>id.</u> at 290 <u>with</u> <u>id.</u> at 286-87.)  This inconsistency is a specific,

legitimate reason for questioning the value of Dr. Zappone's
opinion.  <u>See</u> <u>Roberts v. Shalala</u>, 66 F.3d 179, 184 (9th Cir. 1995).

Third, the ALJ stated that Dr. Zappone did not perform
independent objective testing and only administered a limited
mental status exam.  (Admin. R. at 24.)  But Dr. Zappone
interviewed Plaintiff and conducted a number of mental status exams
including short term memory, serial sevens, and counting forward
and backward.  (<u>Id.</u> at 286.)  The doctor also reported that Le
"showed poor eye contact and he appeared quite preoccupied."  (<u>Id.</u>)
He further noted that Plaintiff "was sloppily dressed and he
appeared quite distracted."  (<u>Id.</u>)  Dr. Zappone found Le "was
oriented to time, place and person . . . [but was] unable to recall
what he had for breakfast."  (<u>Id.</u>)  Dr. Zappone performed objective
testing and a mental status exam, therefore, the ALJ's third reason
to disregard Dr. Zappone's opinion is not supported by substantial
evidence in the record.

The ALJ also rejected Dr. Zappone's opinion because no
treatment records were supplied.  (<u>Id.</u> at 24.)  An ALJ may
discredit opinions "that are conclusory, brief, and unsupported by
. . . objective medical findings."  <u>Batson</u>, 359 F.3d at 1195.
Further development of the record is only required when the
evidence is ambiguous, the ALJ finds the record is inadequate to
make a disability determination, or the ALJ relies on a medical
expert who finds the record ambiguous.  <u>Tonapetyan</u>, 242 F.3d at
1150.  Judge Carletti did not need further evidence of Le's mental
impairments to make a determination of Le's disability, so further
development of the record is not required.  The ALJ had a

43                                              05cv2030 WQH (RBB)

legitimate reason to discredit Dr. Zappone's opinion because no
treatment notes were submitted.

Long after the ALJ's decision became final on September 28,
2005, Plaintiff attached Dr. Zappone's pre- and post-hearing
treatment notes to his Reply in this case.  (See Pl.'s Reply, Ex.
A.)  This new evidence submitted after the ALJ's decision cannot be
considered by this Court in deciding whether to affirm the ALJ's
decision.  Cotton, 799 F.2d at 1409.  "A reviewing court may remand
a case to the Secretary for consideration of new evidence where:
(1) the new evidence is material; and (2) good cause exists for the
claimant's failure to incorporate the evidence in a prior
proceeding."  Cotton, 799 F.2d at 1409 (citing 42 U.S.C. § 405(g);
Key, 754 F.2d at 1551).  The more recent treatment notes appear to
be cumulative, and the Plaintiff does not explain why the pre-
decision evidence was not introduced in the administrative
proceeding.  (See Pl.'s Mem. 1-25.)  Accordingly, the late
submission of this evidence does not warrant a remand to the
Secretary for further consideration.

The ALJ's fifth and seventh criticisms of the doctor's
opinion are that he did not conclude that Le was responding to
internal stimuli, and he failed to assess Le's insight and
judgment.  (Admin. R. at 24.)  Dr. Zappone did not specifically
address these items.  (See id. at 285-87.)  There is no specific
requirement that a psychiatrist assess the response to internal
stimuli to render an opinion on the claimant's mental capacity.
"The individual case facts determine the specific areas of mental
status that need to be emphasized during the examination."  20
C.F.R. part 404, subpart P, app. 1, § 12.00(D)(4) (listing the

areas generally included in a comprehensive mental status
examination); see also Lowe v. Barnhart, No. 04 C 2022, 2004 U.S.
Dist. LEXIS 19609, at *30 n.5 (N.D. Ill. Sept. 28, 2004).  There is
nothing in the record to indicate that judgment, insight and the
response to internal stimuli are central to the assessment of Le's
condition.   Standing alone, these are not specific and legitimate
reasons to accord less weight to Dr. Zappone's opinion.  But see 20
C.F.R. part 404, subpart P, app. 1, § 12.00(D)(4) (describing a
comprehensive mental status exam as generally including a
description of judgment and insight).

     The ALJ's sixth reason to limit Dr. Zappone's opinion is that
the doctor opined on matters reserved for the Commissioner.  Dr.
Zappone stated that Le is "permanently disabled." (Admin. R. at
287.)  This is a matter reserved for the Commissioner and is a
specific and legitimate reason for disregarding the doctor's
conclusion.  See 20 C.F.R. § 404.1527(e)(1).

     Judge Carletti's eighth criticism was that the doctor's
opinion was conclusory. (Admin. R. at 24.)  Dr. Zappone described
his interview with the Plaintiff and a number of mental status
exams including short term memory, serial sevens, and counting
forward and backwards. (Id. at 286.)  The doctor also reported
that Le "showed poor eye contact and he appeared quite
preoccupied." (Id.)  Additionally, Dr. Zappone noted that
Plaintiff "was sloppily dressed and he appeared quite distracted."
(Id.)  Le "was oriented to time, place and person" at the
examination. (Id.)  Plaintiff could not "recall what he had for
breakfast[,]" stated that he would burn food when attempting to
cook, and "had difficulty concentrating." (Id.)  "He showed

45

psychomotor retardation." (Id. at 286.)  The doctor's evaluation
was based on these assessments.  Therefore, the ALJ's criticism
that the opinion was conclusory is not a legitimate reason to
disregard Dr. Zappone's opinion.

Ninth, the ALJ discounted Dr. Zappone's opinion because it was
"not supported by longitudinal objective evidence of record." (Id.
at 24.)  An ALJ may discredit opinions "that are . . . unsupported
by . . . objective medical findings." Batson, 359 F.3d at 1195.
Le testified that Dr. Zappone treated him "three or four times."
(Admin. R. at 338.)  Belatedly, Plaintiff asserts that Dr. Zappone
treated Le on January 22, and February 11, 2005.  (Pl.'s Reply 7.)
Attached to the Reply were Dr. Zappone's treatment and progress
notes, which corroborate these treatment dates.  (See Pl.'s Reply,
Ex. A.)  This new evidence was submitted after the ALJ's decision
and without good cause for the tardy submission.  It cannot be
considered by this Court in deciding whether to affirm the ALJ's
decision.  Cotton, 799 F.2d at 1409.  The record available to Judge
Carletti only included Dr. Zappone's March 6, 2005, report and
review form along with Le's hearing testimony.  (See Admin. R. at
285-92, 338.)  Without the additional record supplied after the
ALJ's decision, this is a legitimate reason for discounting Dr.
Zappone's opinion.

Finally, the ALJ also disregarded the doctor's opinion because
the evaluation was "unclear" regarding the duration of Le's
impairments.  (Id. at 24.)  Dr. Zappone, however, stated that Le
"has become increasingly depressed and despondent since his wife
left him many years ago." (Id. at 285.)  The doctor then stated Le
is "permanently disabled." (Id. at 287.)  This implies that the

depression began at the inception of Le's marital problems and will
continue indefinitely.  The duration, according to Dr. Zappone,
spans more than the requisite twelve-month period.  See 42 U.S.C. §
423(d)(1)(A); see also Gutierrez v. Apfel, 199 F.3d 1048, 1050 (9th
Cir. 2000) (finding that the durational requirement was satisfied
where the treating physician "does not express any opinion that the
claimant's condition will materially improve within twelve
months[]").  Therefore, this is not a specific and legitimate
reason for rejecting Dr. Zappone's opinion.

Overall, the district court should affirm Judge Carletti's
decision to discount Dr. Zappone's opinion because the ALJ gave
sufficient specific and legitimate reasons for giving the doctor's
opinion minimal weight.

**5.   Dr. Henderson**

Judge Carletti accorded little weight to the opinion of Dr.
Henderson for the following reasons:  (1) The doctor provided
limited and illegible treating notes; (2) the evidence of record as
a whole does not support the doctor's conclusions; (3) Dr.
Henderson opined on matters reserved to the Commissioner; (4) the
opinions concerned matters for which Dr. Henderson did not treat
Plaintiff and which were outside his area of expertise as a
psychiatrist; (5) his opinions were conclusory and based upon
Plaintiff's self-report or information provided by Le's attorney;
(6) Dr. Henderson acted as an advocate for Le; (7) he "did not set
forth the report of any comprehensive mental status examination,
but rather, summarized the purported signs exhibited by the
claimant in treatment notes which are not a part of the record; and
(8) the extraneous treatment notes reflected an improvement in Le's

47

1  condition, which was not consistent with Dr. Henderson's final

2  report.  (Admin. R. at 20, 24.)

3      First, the ALJ discredited Dr. Henderson's opinion because of

4  limited and illegible treatment notes.  (Id. at 24.)  The ALJ has a

5  duty to develop the record "when there is ambiguous evidence, or

6  the record is inadequate to allow for proper evaluation of the

7  evidence."  Mayes, 276 F.3d at 462.  Dr. Henderson's 2003 treatment

8  notes consisted of two pages with limited writing.  (See Admin. R.

9  at 182-83.)  Although illegible notes would be considered

10 ambiguous, the ALJ would only have a duty to develop the record if

11 he thought it necessary to review the notes to make a determination

12 of Le's disability claim.  The ALJ did not require the added

13 evidence to make this determination because he had Dr. Henderson's

14 November 19, 2004, report at the hearing.  The July 12, 2005,

15 letter from Dr. Henderson, submitted to the Appeals Council, was

16 duplicative of Dr. Henderson's November 19, 2004, report and does

17 not change the analysis.  (Id. at 8, 293-96, 329.)  Nevertheless,

18 the partial-legibility of the notes was not a legitimate reason to

19 discredit Dr. Henderson's opinion.

20     Second, Judge Carletti criticizes Dr. Henderson's conclusion

21 because the evidence does not reflect longitudinal symptoms or

22 clinical or laboratory abnormalities consistent with the doctor's

23 findings.  (Id. at 24.)  Dr. Henderson, however, treated Le longer

24 than any of the other doctors -- approximately six months.  (Id. at

25 182-83.)  Furthermore, he prepared a follow-up report approximately

26 one year after last treating Le.  (Id. at 293-96.)  The doctor

27 stated that Le "consistently performed in the grossly deficient/

28 severely disabled ranges" in his therapy sessions.  (Id. at 295.)

48

He reiterated a similar conclusion on July 12, 2005.  (<u>Id.</u> at 329.)
Dr. Henderson's opinion is also consistent with the opinions of
Drs. Morgan, DiCicco, Grisolia, and Zappone.  (<u>See id.</u> at 267, 283,
285, 297.)  "Because treating physicians are employed to cure and
thus have a greater opportunity to know and observe the patient as
an individual, their opinions are [generally] given greater weight
than the opinions of other physicians."  <u>Smolen v. Chater</u>, 80 F.3d
1273, 1285 (9th Cir. 1996) (citing <u>Rodriquez v. Bowen</u>, 876 F.2d
759, 761-62 (9th Cir. 1989); <u>Sprague</u>, 812 F.2d at 1230).  This
reason for rejecting the doctor's opinion is not supported by the
record evidence.

The third reason given by the ALJ to detract from Dr.
Henderson's opinion was that the doctor rendered opinions on
matters reserved for the Commissioner.  (Admin. R. at 24.)  Dr.
Henderson stated Le is "unable to work" and that his condition
"would prevent him from gainful employment."  (<u>Id.</u> at 295.)  These
are decisions reserved for the Commissioner and a legitimate reason
to disregard this aspect of the opinion.  <u>See</u> 20 C.F.R. §
404.1527(e)(1).

Fourth, the ALJ stated that Dr. Henderson commented on Le's
physical ailments, which are not within his area of expertise as a
psychiatrist and for which he did not treat Plaintiff.  (Admin. R.
at 24.)  The doctor reported that Le "has severe orthopedic
problems in addition to his status post tuberculosis."  (<u>Id.</u> at
294.)  He also found that Le's x-rays indicated cervical
instability and discogenic disease "causing him pain in addition to
the chronic obstructive pulmonary disease which make[s] him short
of breath upon the slightest exertion."  (<u>Id.</u>)  The fact that Dr.

Henderson is a psychiatrist, and not a physician specializing in physical ailments, is a legitimate reason to give less weight to his opinion regarding Le's physical ailments. See Holohan, 246 F.3d at 1202 (citing 20 C.F.R. § 404.1527(d)(5)); but see Sprague, 812 F.2d at 1232.

The ALJ's fifth and seventh concerns about Dr. Henderson's opinion were that it was conclusory and that the doctor performed a limited mental status exam. (Admin. R. at 24.) Dr. Henderson noted Plaintiff was "frail" and looked "older than his stated age and [wa]s not oriented to date, place and time." (Id. at 293.) The doctor conducted an intelligence test and interviewed Le several times. (Id. at 293-96.) He reported that Le was unable to "perform serial 3s" and could not "recall three nouns after three minutes." (Id. at 294.) Dr. Henderson also administered a portion of the Raven's Standard Progressive Matrices. (Id. at 295.) The opinion was based on these tests, evaluations, and observations. (See id.) Several other physicians drew similar conclusions after examining Le. (See id. at 286 (Dr. Zappone), 298 (Dr. DiCicco).) These opinions add credibility to Dr. Henderson's findings. See Lester, 81 F.3d at 832. Therefore, these are not legitimate reasons for discrediting Dr. Henderson's opinion.

Judge Carletti's sixth reason for limiting the weight of the doctor's opinion was that Dr. Henderson advocated for Le by attacking Dr. Engelhorn's evaluation. (See id. at 295.) "Credibility determinations are the province of the ALJ." Fair v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989) (citing Russell v. Bowen, 856 F.2d 81, 83 (9th Cir. 1988)). Dr. Henderson's critical discussion of Dr. Engelhorn's evaluation and allegation that Dr.

50

Engelhorn had a "pervasive bias against applicants for social security benefits" reads like the report of an advocate, not a healer. (Admin. R. at 295.) Therefore, Dr. Henderson's opinion may be discounted for this reason.

Finally, the ALJ's states treatment notes of Dr. Henderson that are not a part of the record conflict with the doctor's opinion and reflect improvement in Le's condition. (Admin. R. at 24.) This Court cannot comment on treatment notes not in the record. According to the treatment notes in the record, Plaintiff continuously showed signs of helplessness, suicidal thoughts, panic, depression, and paranoia. (Id. at 182-83.) Because the treatment notes in the record contradict the ALJ's statement, this is not a legitimate reason for discrediting Dr. Henderson's opinion.

Nevertheless, the ALJ had legitimate reasons to limit the weight of Dr. Henderson's opinion: The opinion related to matters reserved for the Commissioner; the psychiatrist provided an opinion on Le's physical conditions; and Dr. Henderson's advocacy was an attack on another doctor's motivation. Although the legitimate reasons for discounting Dr. Henderson's opinion are limited, they infect his entire opinion. Consequently, the ALJ gave specific and legitimate reasons for discounting the opinion of this treating psychiatrist.

"Where, as here, the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003) (citing Thomas v. Barnhart, 278 F.3d 947, 956-57 (9th Cir. 2002)). Where the medical expert's assessment is

1   inconsistent with other evidence in the record, the ALJ only needs
2   legitimate reasons based on substantial evidence for rejecting the
3   treating physicians' opinions, not clear and convincing reasons.
4   Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983).  Contrary
5   opinions may serve as additional specific and legitimate reasons.
6   Tonapetyan, 242 F.3d at 1149.  Here, Le's treating physicians'
7   opinions were contradicted by the opinions of examining
8   psychiatrist Dr. Engelhorn and by non-examining psychiatrist, Dr.
9   O'Malley, physician, Dr. Manolokas, and medical expert Dr. Bolter.
10  (Id. at 235, 241, 344.)

11      Judge Carletti's opinion included specific and legitimate
12  reasons based on substantial record evidence to discredit the
13  doctors' opinions.  "If the evidence can support either outcome,
14  the court may not substitute its judgment for that of the ALJ."
15  Tackett v. Apfel, 180 F.3d at 1098 (quoting Matney, 981 F.2d at
16  1018.)  Therefore, the district court should **DENY** Plaintiff's
17  motion for summary judgment; the ALJ did not improperly reject the
18  opinions of Plaintiff's treating physicians.

19  **B.    The ALJ Properly Rejected Plaintiff's Subjective Pain and**
20  **Symptom Complaints.**

21      Le argues that Judge Carletti "failed to consider plaintiff's
22  objective and subjective symptom testimony in evaluating his
23  physical impairments." (Pl.'s Mem. 5.)  Plaintiff's complaint
24  alleged the following conditions:  lung disease, tuberculosis,
25  severe lung lesion, heart disease, lung mass, dermatitis, chronic
26  obstructive pulmonary disease, osteoarthritis, sleep disorder,
27  cardiomegaly, left ventricular hypertrophy, diabetes, lumbar and
28  cervical spine disease, left inguinal hernia, spinal instability,

degenerative discogenic disease of the lumbar spine and cervical spine, depression, and post-traumatic stress disorder. (Id. at 2-3.)

At the hearing, Le testified that he stopped working due to a combination of physical and mental problems. (Admin. R. at 338.) Plaintiff stated he could only walk about one block, sit for a limited time, and lift or carry five to ten pounds. (Id. at 339.) Le also said he suffered from lung disease, had difficulty breathing, and back and neck pain. (Id. at 340-41.) Plaintiff reported he suffered from depression, which began after his wife left him and worsened when he stopped working. (Id. at 343.)

An ALJ may reject a claimant's subjective pain or symptom testimony entirely if the claimant fails to produce any objective medical evidence of an impairment that could reasonably be expected to produce the claimed symptoms or pain. Cotton, 799 F.2d at 1407. The severity of pain need not be proven by objective medical evidence; the medical evidence must only show that some degree of the claimed symptom could result from the impairment. Smolen, 80 F.3d at 1282 (citing Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1994); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

The level of pain experienced from a given physical impairment varies from person to person. Id. (citing Fair, 885 F.2d at 601). The severity of the pain is an individual, subjective phenomenon that no social security claimant is required to prove through objective medical evidence. Id. at 1282 n.2. The ALJ may not reject the claimant's subjective testimony without "specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281. "Unless there is affirmative evidence showing that the claimant is

malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'"  <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998) (quoting <u>Lester</u>, 81 F.3d at 834; <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989)).

The ALJ must also state with specificity the symptoms he is rejecting as not credible and the facts in the record on which he is basing his decision.  <u>Smolen</u>, 80 F.3d at 1284; <u>see</u> <u>also</u> <u>Varney v. Sec'y of Health & Human Servs. (Varney I)</u>, 846 F.2d 581, 584 (9th Cir. 1988), <u>modified on reh'g</u>, 859 F.2d 1396 (9th Cir. 1988) (holding that an ALJ's failure to "isolate particular complaints of pain and discuss the evidence suggesting that those complaints [we]re not credible. . . . [was] improper as a matter of law").

> In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains.

<u>Light v. Soc. Sec. Admin.</u>, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ must also consider the observations of physicians and other third parties, precipitating and aggravating factors, and functional restrictions caused by the symptoms.  <u>Smolen</u>, 80 F.3d at 1284.  "[A] finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain."  <u>Light</u>, 119 F.3d at 792 (citing <u>Lester</u>, 81 F.3d at 834).

Plaintiff presented objective medical evidence of the following conditions:  lung lesion, left pneumothorax, tuberculosis, neck and back pain, osteoarthritis, headaches, psoriasis, inguinal hernia, depression, anxiety, psychotic features, and post-traumatic stress disorder.  (Admin. R. at 135-

36, 195, 268, 281, 296.)  Judge Carletti did not find that Le was

malingering.  (See id. at 16-26.)  Therefore, the ALJ was required

to give specific, clear and convincing reasons supported by the

record for rejecting Plaintiff's subjective complaints.  See

Regennitter v. Comm'r of Soc. Sec. Admin., 166 F.3d 1294, 1296 (9th

Cir. 1999) (finding reasons given by ALJ insufficient when not

supported by substantial evidence in the record).

        In Le's case, the ALJ listed ten specific reasons for

rejecting Le's allegations.  (Admin. R. at 25.)  First, the ALJ

found that Le "is able to perform work activities" based on Dr.

Bolter's opinion.  (Id. at 25.)  Judge Carletti rejected Le's

subjective symptom testimony because it differed from Dr. Bolter's

opinion.  (Id.)  Le complained of a long list of physical

impairments and mental impairments that Plaintiff claims make him

unable to work.  (Pl.'s Mem. 2-3; Admin. R. at 338.)  Dr. Bolter,

the medical expert, stated Plaintiff's mental conditions only

moderately or mildly affected his daily living, social activities,

persistence, pace, concentration, and decompensation.  (Admin. R.

at 354.)  The doctor stated Le had mild restrictions on simple

repetitive tasks in non-public environments with peer and

supervisor contact; however, Dr. Bolter, a psychiatrist, did not

comment on Plaintiff's physical impairments.  (Id.)  Le could be

disabled on the basis of his physical impairments or based on a

combination of his physical and mental impairments, as he argues.

(Pl.'s Mem. 25); see 20 C.F.R. § 220.102; Cotton, 799 F.2d at 1403.

Because Dr. Bolter could not opine on the effect of Plaintiff's

physical impairments on his ability to work, the first stated

1   rationale is not a legitimate reason for rejecting Le's
2   allegations.

3       This is also true of Judge Carletti's second and third reasons
4   -- that Dr. Engelhorn and agency psychiatrists opined the claimant
5   was able to perform simple, repetitive tasks.  (Admin. R. at 25.)
6   Dr. Engelhorn expressed no opinion regarding Le's physical
7   impairments, other than to state that Le's disability "appears to
8   be mostly related to his respiratory disease."  (Id. at 237.)  He
9   did conclude that "[f]rom a strictly psychiatric point of view, the
10  patient is capable of doing simple, repetitive tasks."  (Id.)
11  Likewise, the state agency psychiatrists determined Le is "able to
12  persist at simple tasks (unskilled work)."  (Id. at 241.)  The
13  agency physicians, not psychiatrists, noted Plaintiff's need to
14  avoid lung irritants.  (Id. at 261-62.)  Judge Carletti's second
15  and third reasons are not entirely supported by the record.
16  Nevertheless, even if the ALJ's first three reasons for
17  discrediting Le's subjective symptom testimony are not clear and
18  convincing reasons to reject the allegation that Plaintiff is
19  disabled due to physical impairments or a combination of
20  impairments, Judge Carletti gives additional reasons that satisfy
21  the standard.

22      The ALJ's fourth reason for rejecting Le's subjective symptom
23  testimony was that "the record does not contain ongoing reports of
24  symptomology consistent with the claimant's allegations[,]" Dr.
25  Sidrick's treating records "were generally benign except for
26  occasional reports of orthopedic pain[,]" and Plaintiff's lung
27  condition had resolved and "is not associated with ongoing symptoms
28  or clinical abnormalities."  (Id. at 25.)

First, Judge Carletti did not find Le's degenerative disc
disease or his neurologic and headache disorder to be severe. (<u>See</u>
<u>id.</u> at 26.)  Dr. Resnikoff reported that Le felt his conditions had
improved.  (<u>Id.</u> at 201.)  The ALJ noted that Le denied having
significant headaches in his physical treatment records, including
the July 2003 laboratory examination for tuberculosis and five
follow-up visits between September and December of 2003.  (<u>Id.</u> at
19-20; <u>see</u> <u>id.</u> at 157-63, 193-95, 201-05, 213.)  Dr. Grisolia's
"comprehensive neurologic examination [indicated Le was] normal[,]"
but he noted a "daily headache disorder."  (<u>Id.</u> at 267.)  Regarding
Le's psoriasis, the ALJ properly noted Le "was treated only through
December 1997, at which time he had no symptoms of significance."
(<u>Id.</u> at 18; <u>see</u> <u>id.</u> at 107-34.)

Second, Judge Carletti correctly found Dr. Sidrick's
evaluation "generally benign except for occasional reports of
orthopedic pain," between January 15, 2004, and November 1, 2004,
but on November 1, 2004, Dr. Sidrick reported Plaintiff's lungs
were normal, although there was some back and neck pain.  (<u>Id.</u> at
25, 276, 279.)

Finally, the ALJ noted the hospital discharged Plaintiff with
instructions to resume all previous activities as tolerated after
treatment for his lung ailments.  (<u>Id.</u> at 19, 25, 136.)  The ALJ
also reported that the November 2003 treating records of Dr.
Resnikoff, the pulmonologist to which Scripps referred Le,
indicated an improving condition.  (<u>Id.</u> at 19, 201.)  The record
supports the ALJ's findings and shows Le's lung condition was
properly treated, and Plaintiff's functioning returned to normal.
The ALJ's fourth rationale stated clear and convincing reasons for

1   rejecting Le's subjective allegation of disability caused by his

2   prior physical ailments.  (See id. at 25.)

3       The ALJ also rejected Le's subjective symptom testimony for a

4   fifth reason:  "[T]he record does not contain references to reports

5   of disabling side effects of medications."  (Id. at 25.)  On

6   November 19, 2004, Dr. Henderson mentioned medication side effects.

7   (Id. at 293, 296.)  Dr. Henderson stated Le has "chronic fatigue

8   and sedation due to residual effects of narcotics medication

9   . . . ."  (Id. at 296.)  The doctor's treatment notes indicate a

10  side effect ("panic") was present.  (Id. at 182-83.)  Dr. Zappone

11  reported that Plaintiff "needs medication monitoring for his

12  antidepressant and antipsychotic medication."  (Id. at 287.)  Dr.

13  Grisolia reported Le "denie[d] medication sensitivities . . . ."

14  (Id. at 267.)  Le apparently did not complain of side effects to

15  these doctors, and no other doctors reported on the presence or

16  absence of disabling side effects caused by Plaintiff's

17  medications.  (See id. at 267, 283, 285-87, 296.)  In his August

18  13, 2004, disability report, Le stated that none of the medications

19  he was taking at the time caused any side effects.  (Id. at 102,

20  106.)  But Plaintiff testified at the hearing that his medications

21  caused sleepiness, some dizziness, and prevented him from driving.

22  (Id. at 337, 343, 359.)  In the five-page, post-hearing report by

23  Dr. Henderson (id. at 317-21), he noted that different medications

24  have been prescribed for Le, but the treating doctor does not

25  describe any medication side effects.  (Id. at 317.)

26      An ALJ may reject a claimant's allegations of disabling side

27  effects when the record contains no evidence that the side effects

28  were ever reported to treating physicians.  See Ownbey v. Shalala,

58                                                   05cv2030 WQH (RBB)

5 F.3d 342, 345 (8th Cir. 1993). Judge Carletti did not err in rejecting Le's allegations of disabling medication side effects.

The ALJ stated as a sixth reason for rejecting Le's subjective complaint that Dr. Resnikoff reported that Le felt improved; his examinations remained unremarkable; his condition was stable; and he needed only a nine-month course of treatment. (Admin. R. at 25.) On July 21, 2003, Le was discharged from Scripps Hospital and instructed "to resume all previous activities tolerated . . . ." (Id. at 136.) He was also told to return for "pain not relieved by medicine." (Id.) Dr. Resnikoff reported that Le had mild back pain on November 24, 2003, but on December 23, 2003, Plaintiff was feeling a little better. (Id. at 201-02.) Examinations of Le indicated only minor ailments such as cough, skin problems, and orthopedic pain. (Id. at 201-05.) Judge Carletti's sixth reason for rejecting Le's subjective complaints is clear and convincing and based on substantial record evidence.

The ALJ's seventh reason was that "there are no psychiatric treatment records after December 2003, as of which time there were no medication side effects and thoughts were clear, according to Dr. Henderson." (Id. at 25.) Dr. Henderson's treatment notes from December 13, 2003, indicate Le's thoughts were clear, and except for panic concerns, there were no medication side effects. (Id. at 183.) Treatment records of Dr. Zappone submitted after the ALJ's decision do not meet the standard for delayed submissions, so they cannot be considered by this Court in deciding whether to affirm the ALJ's decision. Cotton, 799 F.2d at 1409. The absence of evidence of continuing psychiatric treatment is a clear and convincing reason to reject Le's subjective complaints of

continuing mental ailments.  Dr. Henderson's July 12, 2005,
critique of both Dr. Bolter's testimony and the decision of the
administrative law judge (id. at 217-21) does not change this
conclusion.

     As an eighth reason for rejecting Le's complaints, the ALJ
stated that "aside from the claimant's acute episode of reducible
hernia, after 2003 the claimant was only treated by Dr. Sidrick
. . . during which time complaints were variable, and clinical
signs were generally benign and certainly not consistent with
greater limitations than those which [the ALJ] f[ou]nd." (Id. at
25.)

     In treatment records throughout 2004, Dr. Sidrick noted that
Le's heart and lungs were normal, and his general physical
functioning was also normal.  (See id. at 276, 278-81.)  At the
same time, Dr. Sidrick diagnosed Le with an upper respiratory
infection on January 15, 2004, and with chronic pulmonary emphysema
on March 5 and April 15, 2004.  (Id. at 279-81.)  Dr. Sidrick also
diagnosed Plaintiff with a lung mass and tuberculosis.  (Id. at
279.)

     Plaintiff's symptom complaints varied.  In April and November
2004, he complained of neck pain, and he saw a radiologist in
October 2004 for an x-ray exam of his cervical and lumbar spine.
(Id. at 275-76, 279.)  On March 5, 2004, Le reported difficulty
sleeping, but this complaint does not appear in Dr. Sidrick's other
notes.  (Id. at 280.)  Plaintiff reported coughing and sneezing at
several appointments.  (Id. at 276, 278, 281.)  Le's complaints are
fairly consistent throughout Dr. Sidrick's treatment notes.  Judge

1   Carletti's rejection of Le's allegations of physical impairments is
2   not supported by the record.

3        The ninth reason set forth by the ALJ for rejecting Le's
4   allegation of disability is that being fired from his job due to
5   tuberculosis "is not the same as being unable to perform that
6   position secondary to the severity of his impairments." (<u>Id.</u> at
7   25.)  In Plaintiff's initial disability report, Le states that the
8   following conditions limited his ability to work:  post
9   tuberculosis disease, chronic headache, fainting spells, arthritis
10  pain, skin allergy and scratches, frequent fever, coughing,
11  sweating, insomnia, nightmares, memory loss, anxiety, and
12  depression.  (<u>Id.</u> at 71.)  Le reports he was first bothered by his
13  alleged conditions in 1998, but he continued to work until 2003.
14  (<u>Id.</u>)  In 2003, Le "could no longer engage in[] the part time job
15  due to fewer [sic] and frequent tiredness, and fainting spell[s]."
16  (<u>Id.</u>)  Le, however, stated that he stopped working because he was
17  laid off due to his tuberculosis, not because of inability to
18  perform the work.  (<u>Id.</u>)  This is a clear reason for rejecting
19  Plaintiff's subjective allegations.

20       Finally, Judge Carletti cites Le's "multiple inconsistent
21  statements as to his literacy and ability to communicate in
22  English" to question Plaintiff's credibility and reject Le's
23  subjective complaints.  (<u>Id.</u> at 25.)  "In assessing the claimant's
24  credibility, the ALJ may use 'ordinary techniques of credibility
25  evaluation,' such as considering the claimant's reputation for
26  truthfulness and any inconsistent statements in h[is] testimony."
27  <u>Tonapetyan</u>, 242 F.3d at 1147-48 (citing <u>Fair</u>, 885 F.2d at 604 n.5).
28  Le testified he could not read or write in English.  (Admin. R. at

335.)  Plaintiff also stated that he used to understand some
English but no longer remembers any.  (Id. at 335.)  Le used an
interpreter in his consultations with Drs. Engelhorn, Henderson,
and DiCicco.  (Id. at 235, 293, 297.)  Drs. Henderson and DiCicco
both stated that Le did not speak English.  (Id. at 293, 298.)  In
his Disability Report, however, Le stated he could read and write
limited English, and he could speak very limited English.  (Id. at
70.)  Dr. Grisolia stated Le "understands a little English, but
speaks minimal English."  (Id. at 267.)  The ALJ's reasoning is
clear but not convincing.  Le's slight inconsistencies regarding
his minimal English capabilities do not amount to a reason for
attacking his credibility.

Where the ALJ has made specific findings "supported by
substantial evidence in the record, our role is not to second-guess
that decision."  Fair, 885 F.2d at 604.  Not all of Judge
Carletti's reasons for rejecting Le's subjective complaints were
clear and convincing.  Nevertheless, the district court should **DENY**
Plaintiff's request for reversal because the ALJ provided several
clear and convincing reasons supported by substantial record
evidence for rejecting Le's subjective complaints.

C.  **Plaintiff's Mental Impairments Do Not Meet Listings 12.04 OR
    12.06.**

At step three of the five-step process, Judge Carletti found
Le's impairments -- pulmonary disease, arthritis, dermatitis, and
adjustment disorder -- were severe, but did not meet or equal any
listing in Appendix I, Subpart P, Regulations No. 4, either in
combination or separately.  (Admin. R. at 18, 26.)  Plaintiff
disagrees and argues that he meets the criteria for Medical Listing

12.04 (affective disorder) and 12.06 (anxiety-related disorder). (Pl.'s Mem. 14-18.)

Eight separate reports were submitted regarding Le's mental status.  (See Admin. R. at 218, 235, 241, 267, 283, 285, 293, 297.) The findings in these reports address the criteria of 20 C.F.R. sections 404 App. 1 to Subpart P 12.04 and 12.06.

Analyzing an alleged mental disability requires two inquiries. Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 974 (9th Cir. 2000).  First, the "ALJ must determine whether there is evidence to 'medically substantiate the presence of a mental disorder.'"  Id. (citing 20 C.F.R. part 404, subpart P, app. 1 § 12.00A).  Second, "the ALJ must determine whether the 'severity' of the claimant's 'functional limitations' are 'incompatible with the ability to work.'"  Id. (citing 20 C.F.R. part 404, subpart P, app. 1 § 12.00A).

Medical Listing 12.04 describes affective disorders as "[c]haracterized by a disturbance of mood, accompanied by a full or partial . . . depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  20 C.F.R. part 404, subpart P, app. 1 § 12.04.  To meet the listing for an affective disorder based upon depression, a claimant must meet two different sets of criteria:

> A.   Medically documented persistence, either continuous or intermittent, of one of the following:
> 1.   Depressive syndrome characterized by at least four of the following:
> a.   Anhedonia or pervasive lost of interest in almost all activities; or
> b.   Appetite disturbance with change in weight; or
> c.   Sleep disturbance; or
> d.   Psychomotor agitation or retardation; or
> e.   Decreased energy; or

        f.   Feelings of guilt or worthlessness; or
        g.   Difficulty concentrating or thinking; or
        h.   Thoughts or suicide; or
        i.   Hallucinations, delusions or paranoid thinking
             OR . . .

    AND

        B.   Resulting in at least two of the following:
        1.   Marked restriction of activities of daily
    living; or
        2.   Marked difficulty in maintaining social
    functioning; or
        3.   Marked difficulties in maintaining
    concentration, persistence, or pace; or
        4.   Repeated episodes of decompensation, each of
    extended duration;

    OR

        C.   Medically documented history of a chronic
    affective disorder of at least 2 years' duration that has
    caused more than a minimal limitation of ability to do
    basic work activities, with symptoms or signs currently
    attenuated by medication or psychosocial support, and one
    of the following:
        1.   Repeated episodes of decompensation, each of
    extended duration; or
        2.   A residual disease process that has resulted in
    such marginal adjustment that even a minimal increase in
    mental demands or change in the environment would be
    predicted to cause the individual to decompensate; or
        3.   Current history of 1 or more years' inability
    to function outside a highly supportive living
    arrangement, with an indication of continued need for
    such an arrangement.

20 C.F.R. part 404, subpart P, app. 1 § 12.04 (2006).

    Similarly, to meet the listing for an anxiety-related

disorder, a 12.06 Listing, a claimant must meet both:

        A.   Medically documented findings of at least one
    of the following:
        1.   Generalized persistent anxiety accompanied by
    three out of four of the following signs or symptoms:
        a.   Motor tension: or
        b.   Autonomic hyperactivity; or
        c.   Apprehensive expectation; or
        d.   Vigilance and scanning;

    OR

                              64                    05cv2030 WQH (RBB)

2.   A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3.   Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4.   Recurrent obsessions or compulsions which are a source of marked distress; or
5.   Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B.   Resulting in at least two of the following:
1.   Marked restriction of activities of daily living; or
2.   Marked difficulty in maintaining social functioning; or
3.   Marked difficulties in maintaining concentration, persistence, or pace; or
4.   Repeated episodes of decompensation, each of extended duration.

OR

C.   Resulting in complete inability to function independently outside the area of one's home.

20 C.F.R. part 404, subpart P, app. 1 § 12.06 (2006).

Whether an individual is disabled under the Social Security Act is an administrative finding, not a medical one.  See 20 C.F.R. § 404.1527(e)(1) (2005).  Judge Carletti found Plaintiff's medical impairments and adjustment disorder severe, but he concluded they did not, "individually or in combination, meet or equal any of the criteria set forth in the Listing of Impairments, Appendix I, Subpart P, Regulations No. 4."  (Id. at 18, 25.)  The ALJ gave greater weight to the opinions of Le's examining doctor, Dr. Engelhorn, and the administrative hearing's nonexamining medical expert, Dr. Bolter.  (Id.)  The ALJ's decision shows that he

1  emphasized the "B" and "C" criterion for medical listing

2  impairments 12.04 and 12.06.  (<u>Id.</u> at 18.)

3      Judge Carletti found that Le exhibited "moderate restrictions

4  of activities of daily living, moderate difficulties in maintaining

5  social functioning, mild difficulties in maintaining concentration,

6  persistence, or pace; and one or two episodes of decompensation."

7  (<u>Id.</u>)  Judge Carletti decided Le was able to "understand, remember,

8  and carry out simple instructions on a consistent basis and able to

9  perform simple repetitive tasks."  (<u>Id.</u> at 18, 26.)  He also

10 determined Plaintiff was able to interact appropriately with others

11 in the workplace and was able to adapt to changes in work routine

12 and work location.  (<u>Id.</u>)  The ALJ further decided Le was capable

13 of making routine adjustments in the workplace and responding

14 appropriately to usual work situations.  (<u>Id.</u>)

15     As discussed above, Le's treating physicians' opinions were

16 contradicted by the opinions of examining psychiatrist Dr.

17 Engelhorn and nonexamining psychiatrists Drs. O'Malley and Bolter.

18 (<u>Id.</u> at 235-41, 352-54.)  Where the medical expert's contradictory

19 assessment is consistent with other evidence in the record, the ALJ

20 only needs legitimate reasons based on substantial evidence for

21 rejecting the treating physicians' opinions, not clear and

22 convincing evidence.  <u>Murray v. Heckler</u>, 722 F.2d at 502.  Dr.

23 Engelhorn's and Dr. O'Malley's examinations supply this added

24 contradictory evidence.  Judge Carletti gave specific, legitimate

25 reasons limiting the weight of the treating psychiatrists'

26 opinions.

27     Accordingly, Judge Carletti supported his findings with the

28 opinions of Drs. Engelhorn, O'Malley, and Bolter.  (<u>See</u> Admin. R.

at 16-27.)  Dr. Engelhorn diagnosed Le as having adjustment
disorder with depressed mood and a "very mild form" of possible
psychotic disorder.  (<u>Id.</u> at 237.)  Dr. O'Malley found Le exhibited
possible psychotic disorder and adjustment disorder.  (<u>Id.</u> at 245-
46.)  Dr. Bolter also diagnosed Plaintiff with adjustment disorder
with depressed mood under 12.04.  (<u>Id.</u> at 352.)  These doctors,
however, did not find that Le met the listings under parts B or C
of 12.04 or 12.06.

Even Le's doctors drew some conclusions that support the ALJ's
findings.  For example, Dr. Zappone believed that Plaintiff could
"handle his own funds."  (<u>Id.</u> at 287.)  Dr. DiCicco noted that Le
"takes his children to school, comes back, does some cooking, and
stays most of the day in the house."  (<u>Id.</u> at 297.)  He stated Le
"was cooperative and friendly" during the interview.  (<u>Id.</u> at 298.)

Plaintiff was "adequately dressed and groomed, although he
[did] not wear shoes to the interview" with Dr. Engelhorn.  (<u>Id.</u> at
236.)  The doctor stated Le "is fully capable of taking care of all
of his basic needs[,]" but does not "involve himself in any
household chores."  (<u>Id.</u>)  Le's children take care of the household
chores.  (<u>Id.</u>)  Le also told Dr. Engelhorn that he is capable of
driving but does not drive because of his medications.  (<u>Id.</u>)  Dr.
Engelhorn stated Le's "daily activities appear to be within normal
limits, especially when one factors in cultural issues."  (<u>Id.</u> at
237.)  The doctor found Le was capable of taking care of his daily
needs and capable of simple repetitive tasks, but he did not
comment on any episodes of deterioration.  (<u>See id.</u> at 235-38.)

Dr. Engelhorn noted that Le was "an expressive person . . .
[and was] socially comfortable throughout the interview."  (<u>Id.</u> at

236.)  He also said Plaintiff was not cognitively impaired.  (Id.)
Le told the doctor that he has "no outside social life and [that
he] does not attend any type of religious services."  (Id. at 236.)
Dr. Engelhorn scored Le's GAF at sixty-five to seventy.  (Id. at
237.)  He found Le "could adequately relate to peers and
supervisors in the workplace . . . [and] he could be expected to
make routine adjustments in the workplace."  (Id. at 237.)

Dr. O'Malley stated Plaintiff "is able to interact
appropriately with coworkers, supervisors and the general public."
(Id. at 241.)  He also found Plaintiff "able to adapt to changes in
the workplace."  (Id.)  Dr. O'Malley found Plaintiff had mild
limitations on daily living, moderate difficulties in maintaining
social functioning, mild deficiencies of concentration, pace, or
persistence, and zero to one episode of decompensation.  (See id.
at 253.)  Dr. Bolter found Le had moderate limitations on daily
living and social functioning, mild deficiencies of concentration,
persistence, or pace, and one to two episodes of decompensation.
(See id. at 353-54.)  Therefore, Judge Carletti's decision that
Le's mental impairments did not meet or equal listings 12.04 or
12.06 was supported by substantial record evidence.

D.    **The ALJ's Finding That Le Can Perform His Past Relevant
      Work Should Be Affirmed.**

Judge Carletti found that Le could return to his work as a
newspaper delivery person.  (Id. at 26.)  Plaintiff argues the ALJ
erred by not finding Le disabled under the Medical-Vocational
Guidelines )the "grids").  (Pl.'s Mem. 11-13.)  Le claims that
because Drs. Sidrick, Morgan, and Grisolia limited him to sedentary
work, he is "clearly disabled" under the grids in light of his age,

68                                    05cv2030 WQH (RBB)

1   limited education, and unskilled work experience.  (Id. at 12-13.)

2   Plaintiff asserts that "under a proper step-five analysis the ALJ

3   should have found the plaintiff disabled."  (Id. at 13.)

4       In determining disability under the five-step process, the ALJ

5   assesses Plaintiff's residual functional capacity and past relevant

6   work at step four.  20 C.F.R. 404.1520(a)(4)(iv).  Residual

7   functional capacity is the measure of claimant's ability to

8   function despite his limitations.  20 C.F.R. § 404.1545(a).  If the

9   claimant can still perform his past relevant work, the ALJ will

10  find plaintiff is not disabled.  Id.  "[T]he Grid is applied only

11  if the claimant is unable to perform 'his or her vocationally

12  relevant past work.'"  Macia v. Bowen, 829 F.2d 1009, 1012 (11th

13  Cir. 1987) (citing 20 C.F.R. 404, Subpart P, Appendix 2, §

14  200.00(a)) (emphasis added).

15      Although he complains about application of the grid, Le is

16  also disputing that he is capable of doing his past relevant work.

17  Only if the ALJ finds that the claimant cannot perform his past

18  relevant work, does "the burden shift[] to the Commissioner to show

19  that the claimant can perform some other work that exists in

20  'significant numbers' in the national economy, taking into

21  consideration the claimant's residual functional capacity, age,

22  education, and work experience."  Tackett v. Apfel, 180 F.3d at

23  1100-01 (citing  20 CFR § 404.1560(b)(3)).  "There are two ways for

24  the Commissioner to meet th[is] burden . . . (a) by the testimony

25  of a vocational expert, or (b) by reference to the Medical-

26  Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."  Id.

27  (citing Desrosiers v. Sec'y of Health and Human Servs., 846 F.2d

28  573, 577-78 (Pregerson, J. concurring) (9th Cir. 1988)).

"[W]here an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work[,]" the judge generally consults the tables of the Secretary's Medical-Vocational Guidelines in determining the individual's ability to participate in substantially gainful activities.  20 C.F.R. Pt. 404, subpart P, app. 2 § 200.00(a) (2006).  The Grids dictate the ALJ must find the claimant disabled or not disabled based on "the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity." Id.

Le is currently unemployed and not engaged in substantial gainful activity. (Admin. R. at 336, 338.) Consequently, the ALJ had to determine whether Plaintiff is capable of performing his past work.  The Dictionary of Occupational Titles defines a newspaper carrier as light work and a newspaper delivery driver as medium work.  DOT, supra at 232.  Both listings require minimal reasoning, language, and mathematical skills.  (Id.)

At Plaintiff's hearing, the ALJ heard the testimony of vocational expert Bonnie Sinclair.  She assessed Le's prior work as a newspaper delivery person as light work.  (Id. at 355.)  Sinclair testified that with the residual functional capacity to perform light work, Plaintiff could perform his past relevant work as a newspaper delivery person.  (Id.)

The ALJ decided Le "has the residual functional capacity to perform light work." (Admin. R. at 26.)  Light work is defined as follows:

70

(b) Light work. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R § 404.1567 (2006).

Judge Carletti determined Le is capable of the following: lifting ten pounds frequently, lifting twenty pounds occasionally, sitting, standing or walking six hours per eight hour workday with the avoidance of lung irritants, understanding, remembering and carrying out simple instructions on a consistent basis, performing simple repetitive tasks, interacting appropriately with others in the workplace, adapting to changes in work routine and work location, make routine adjustments in the workplace, and responding to usual work situations. (Id. at 26.)

Judge Carletti's finding that Plaintiff could perform his past work was based on the vocational expert's testimony and the judge's assessment of Le's residual functional capacity. (Id.) "A vocational expert's testimony in a disability benefits proceeding 'is valuable only to the extent that it is supported by medical evidence.'" Gallant, 753 F.2d at 1456 (quoting Sample v. Schweiker, 694 F.2d 639, 643-44 (9th Cir.1982)). Thus the ALJ's finding must be supported by the record evidence.

As discussed in section VI.A, Judge Carletti gave clear and convincing reasons based on substantial record evidence for

attributing less weight to the opinions of Drs. Henderson, Morgan,
DiCicco, Grisolia, and Zappone and instead relying on the opinions
of Drs. Engelhorn, O'Malley, and Bolter.  Dr. Engelhorn reported
that Le could do simple, repetitive tasks, relate to supervisors in
the workplace, and could make "routine adjustments in the
workplace."  (Id. at 237.)  Dr. O'Malley found Le had mild
restrictions on daily living activities, moderate difficulties in
maintaining social functioning, and mild difficulties in
maintaining concentration, persistence, or pace.  (Id. at 253.)
Dr. Bolter testified that Le had moderate restrictions on daily
activities, moderate restrictions on social functioning, mild
difficulties in maintaining concentration, moderate difficulties in
performing complex tasks, and mild difficulties in performing
simple repetitive tasks.  (Id. at 356-57.)

   The ALJ's findings are consistent with a capability of
performing light work as defined by 20 C.F.R § 404.1567.  The
vocational expert testified that newspaper delivery was light work
and that Le can perform his past relevant work.  (Id. at 335.)  If
a claimant is capable of performing his past work, the ALJ does not
consult the grids.  Macia, 829 F.2d at 1012 (citing 20 C.F.R. 404,
subpart P, app. 2, § 200,00(a)).  Accordingly, Judge Carletti did
not err in failing to consult the grids in making Le's disability
determination.  The ALJ's decision that Le is capable of performing
his past relevant work should be affirmed.

**E.   Plaintiff's Limitation to Simple, Repetitive Tasks Does Not
      Prevent Him from Performing His Past Work.**

   In his Reply, Plaintiff contends that driving, which is part
of Le's past employment, is not a simple, repetitive task and,

therefore, he is unable to perform his past work.  (Pl.'s Reply 2-5.)  Le testified that as a newspaper delivery person, he drove "about an hour-something to two hours."  (Admin. R. at 359.) Sinclair testified that whether driving a car was a simple and repetitive task is "really relatively subjective" and depends on the route taken and the consistency of the route each day.  (Id. at 359.)  She further stated that if Le was unable drive two hours per day, he would not be able to do the job of delivering newspapers. (Id. at 360.)

Le had a newspaper delivery route.  He threw newspapers onto the front door of approximately 200 customers.  (Id. at 72.)  He walked about six hours each day, and some standing was involved. (Id.)  Plaintiff testified that he no longer drives "[b]ecause he take[s] too many sleeping pills that affected [him]."  (Id. at 359.)  Le contends that this prevents him from driving, so he cannot perform his past relevant work as a newspaper delivery person.  (Pl.'s Reply 3-4.)

The ALJ rejected Le's subjective complaints and addressed medication side effects.  Judge Carletti concluded that "the record does not contain references to reports of disabling side effects of medications."  (Admin. R. at 25.)  In Le's disability report, he listed his medications and wrote that there were no side effects. (Id. at 102-06.)  Le told Dr. Grisolia he had no medication sensitivities.  (Id. at 267.)  Drs. Zappone, Henderson and Morgan did not note any side effects from sleeping pills.  (Id. at 283, 287, 296, 317.)  But, Dr. Morgan found that Le's antidepressant medications affected his cognitive function.  (Id. at 283.)  Dr.

1   Henderson thought the pain medication caused chronic fatigue and
2   sedation.  (<u>Id.</u> at 296.)

3       In an analogous social security case, the ALJ asked the
4   testifying vocational expert what work a claimant could perform if
5   limited to lifting or carrying ten pounds, standing, walking, or
6   sitting six hours, simple and repetitive tasks, and a non-public
7   environment (the same limitations as found for Le).  <u>Mendell v.</u>
8   <u>Commissioner</u>, Civil No. 00-6087-JO, 2000 U.S. Dist. LEXIS 21448, at
9   *13-14 (D. Or. 2000).  "The [vocational expert] responded that,
10  under these limitations, claimant could still work as an escort
11  vehicle driver."  <u>Id.</u>; <u>see also</u> <u>Walston v. Gardner</u>, 381 F.2d 580,
12  586 (6th Cir. 1967) (describing driving as a "simple function[]").

13      Here, Judge Carletti determined the limited amount of driving
14  involved in Le's past vocation did not involve tasks beyond those
15  that are simple and repetitive.  (<u>See</u> Admin. R. at 25-26.)  This is
16  consistent with other courts' findings.  <u>See</u> <u>Mendell</u>, 2000 U.S.
17  Dist. LEXIS 21448, at *13-14; <u>Walston</u>, 381 F.2d at 586.
18  Furthermore, "'[w]hen the evidence before the ALJ is subject to
19  more than one rational interpretation, we must defer to the ALJ's
20  conclusion.'"  <u>Batson</u>, 359 F.3d at 1198 (quoting <u>Andrews v.</u>
21  <u>Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995)).

22  **F.   The Court Should Affirm The ALJ's Decision.**

23      The record in this case has been thoroughly developed.  Judge
24  Carletti listed specific and legitimate reasons for accepting the
25  examining and nonexamining doctors' opinions of adjustment disorder
26  over those of the treating and other examining doctors' opinions
27  diagnosing Le with affective and anxiety disorders.  The ALJ also
28  provided specific, clear and convincing reasons for discounting

Plaintiff's subjective allegations of disability.  Although the evidence conflicted, the ALJ did not find it ambiguous.  Nor did he conclude that the record was inadequate for the proper evaluation of the evidence.  See Smolen, 80 F.3d at 1288.

A decision to remand for additional evidence or to award benefits is a matter of discretion.  Swenson v. Sullivan, 876 F.2d 683, 689 (9th Cir. 1989) (citing Varney v. Sec'y of Health & Human Servs., 859 F.2d 1396, 1399 (9th Cir. 1988)).  "'In Social Security cases the ALJ has a special duty to fully and fairly develop the record . . . ."  Smolen, 80 F.3d at 1288 (quoting Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983)).  "This duty exists even when the claimant is represented by counsel."  Id.  However, "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Mayes, 276 F.3d at 459-60 (citing Tenapetyan, 242 F.3d at 1150; see also Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001).  For example, if there is no evidence in the record to support a finding for or against a claimant, the record is inadequate and further development is needed.  See Armstrong v. Comm'r of Soc. Sec. Admin., 160 F.3d 587, 589-90 (9th Cir. 1998).

Plaintiff claims that Judge Carletti erred in "failing to develop the record fully and fairly."  (Pl.'s Mot. 1.)  Le argues the ALJ should have subpoenaed Dr. Zappone's treatment notes and Dr. Henderson's notes after July 12, 2004.  (Pl.'s Reply 7, 9; Pl.'s Mem. 19.)  Plaintiff asserts that the ALJ improperly rejected Dr. Henderson's opinion because the doctor's notes were largely illegible.  (Pl.'s Mem. 19; see also Pl.'s Reply 9.)  This is not

1  true.   Judge Carletti gave eight reasons for attributing little

2  weight to Dr. Henderson's opinion.  (Admin. R. at 24.)  The ALJ had

3  specific and legitimate reasons for rejecting the doctor's opinion,

4  as discussed above.  Additionally, the record contains sufficient

5  medical evidence for the ALJ to use in making his disability

6  determination.

7       Plaintiff asserts the ALJ should have subpoenaed Dr. Zappone's

8  treatment notes, which would have established that he was a

9  treating physician.  (Pl.'s Reply 7.)  The ALJ gave specific

10 reasons for attributing little weight to Dr. Zappone's opinion,

11 including the fact that the doctor's diagnosis had internal

12 inconsistencies and was not based on objective medical findings.

13 (See Admin. R. at 23-24.)  Dr. Zappone's opinion was not ambiguous,

14 and the record contained sufficient medical evidence for the ALJ to

15 make his decision.  Thus, Judge Carletti did not err in failing to

16 subpoena additional notes from Drs. Henderson and Zappone.  The ALJ

17 did not have a duty to recontact Drs. Zappone and Henderson.

18 Therefore, the district court should **DENY** Plaintiff's motion and

19 affirm the ALJ's decision.

20 **G.   The Court Should Grant Defendant's Cross-Motion for Summary**

21 **Judgment.**

22      The Defendant moved for summary judgment on April 10, 2006,

23 stating that "the ALJ appropriately assessed Plaintiff's

24 credibility[,] . . . residual functional capacity[,] . . . and

25 severity of . . . impairments."  (Def.'s Cross-Mot. for Summary

26 Judgment 4-10.)  "The decision of the Commissioner must be upheld

27 if it is supported by substantial evidence and if the Commissioner

28 applied the correct legal standards."   Howard ex rel. Wolff v.

1  <u>Barnhart</u>, 341 F.3d 1006, 1011 (9th Cir. 2003) (citing <u>Paqter v.</u>

2  <u>Massanari</u>, 250 F.3d 1255, 1258 (9th Cir. 2001)).  "Substantial

3  evidence is 'more than a mere scintilla but less than a

4  preponderance; it is such relevant evidence as a reasonable mind

5  might accept as adequate to support a conclusion.'" <u>Id.</u> (quoting

6  <u>Sandgathe v. Chater</u>, 108 F.3d 978, 980 (9th Cir. 1997)).

7      As discussed above, this Court finds Judge Carletti applied

8  the correct legal standards.  The ALJ gave specific, clear and

9  convincing reasons supported by substantial evidence of record to

10  limit the weight of Le's subjective complaints of pain and gave

11  legitimate and specific reasons supported by substantial evidence

12  of record to limit the weight of the opinions of Drs. Sidrick,

13  Morgan, Henderson, Grisolia, Zappone, and DiCicco.  The ALJ also

14  appropriately assessed Plaintiff's residual functional capacity.

15  Therefore, the district court should **GRANT** Defendant's Cross-Motion

16  for Summary Judgment.

17                      **VII.  CONCLUSION**

18      For the reasons set forth above, Plaintiff's Motion for

19  Summary Judgment should be **DENIED**, and Defendant's Cross-Motion for

20  Summary Judgment should be **GRANTED**.

21      This Report and Recommendation will be submitted to the United

22  States District Court judge assigned to this case, pursuant to the

23  provisions of 28 U.S.C. § 636(b)(1).  Any party may file written

24  objections with the Court and serve a copy on all parties on or

25  before <u>January 4, 2007</u>.  The document should be captioned

26  "Objections to Report and Recommendation."  Any reply to the

27  objections shall be served and filed on or before <u>January 17, 2007</u>.

28  The parties are advised that failure to file objections within the

1   specified time may waive the right to appeal the district court's

2   order.   _Martinez v. Ylst_, 951 F.2d 1153 (9th Cir. 1991).

3        **IT IS SO ORDERED.**

4

5   DATED:   December 15, 2006

6                                                Ruben B. Brooks
                                                 United States Magistrate Judge

7

8   cc:   Judge Hayes
          All parties of record

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28